UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
COMMUNITY CARE COMPANIONS, INC.,

                Plaintiff,

       - against -

INTERIM HEALTHCARE, INC.,

               Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-4870 (PKC) (LGD)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Community Care Companions, Inc. has brought this action against Defendant

Interim Healthcare, Inc. ("Defendant" or "Interim") for alleged violations of the New York State

Franchise Act, New York State Public Health Law, breach of contract, and breach of fiduciary

duty.  Presently before the Court are the following motions: (1) Defendant's summary judgment

motion on Plaintiff Community Care's surviving causes of action from its Second Amended

Complaint ("SAC"), (2) Defendant's summary judgment motion on three claims in its

Counterclaims and Third-Party Complaint ("TPC") against Plaintiff as well as its President

Alexander Caro ("Caro") and Vice President Mark Gatien ("Gatien") (together, "Third-Party

Defendants") (collectively, "Plaintiff" or  "Community Care")[1]; (3) Defendant's motion to strike

the report and preclude testimony of Plaintiff's expert Roy Breitenbach, (4) Plaintiff's motion to

strike the report and preclude testimony of defense expert Frank Cicero; and (5) Plaintiff's motion

for oral argument on the pending motions in this case.  For the reasons explained below, the Court

---

[1] Because Third-Party Defendants Caro and Gatien have joined Plaintiff Community Care
in opposing summary judgment as well as in moving to strike the report of Defendant's expert,
(*see* Dkts. 111, 112-5), the Court refers to them collectively for the purposes of this Memorandum
& Order.

grants in part and denies in part Plaintiff's motion to strike Frank Cicero's report, grants Defendant's motion to strike Roy Breitenbach's report, and denies Plaintiff's request for oral argument.  The Court also grants in part and denies in part Defendant's motion for summary judgment.

## BACKGROUND

### I.    Factual Background[2]

Interim is a franchisor of medical staffing services, non-medical support services, companion care services, and healthcare-related home medical products.  (Pl.'s R. 56.1 Statement Resp. ("Pl.'s 56.1 Resp."), Dkt. 111-72 ¶ 2.)  As of October 2017, Interim has a net worth on a consolidated basis of more than $15 million.  (*Id.* ¶ 10.)  Interim's franchisees "use [Interim's] service marks, trade names, business systems and procedures," and in exchange, "pay[] royalties." (*Id.* ¶ 2.)  In April 2016, Interim formally terminated the Nassau County location of one of its franchisees, Caring Angels, Inc.  (*Id.* ¶ 80.)  Around that time, James Watson ("Watson"), who is not a party to this lawsuit,[3] owned and operated seven Interim franchises ("Watson Franchises")

---

[2] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).  Here, Third-Party Defendants Caro and Gatien join Plaintiff Community Care's 56.1 statements and counterstatements.  (Dkt. 111-72 at 1.)

[3] As discussed *infra*, Watson sold Plaintiff the Interim franchises that are at issue in this lawsuit.

in New York, which were operated by two corporations,[4] under two separate "licensed home care services agency" licenses ("LHCSA" licenses), servicing 19 New York counties.[5]  (*Id.* ¶¶ 6–7.) Sometime in 2015, one of the Watson Franchises published a job advertisement "requesting a female laid back nurse, no Haitians."  (*Id.* ¶ 73; *see also* Press Release, Dkt. 110-34 at ECF[6] 2.) The New York State Attorney General's Office ("NY AG") subsequently conducted an investigation into this situation and entered into a settlement with the Watson Franchises—all of which was covered by news sources.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 73–74.)  Furthermore, "[t]he settlement with GNY, regarding the 'Haitian incident' was publicized by the NY Attorney General's office."  (*Id.* ¶ 74.)[7]

In or around September 2016, Watson stopped paying royalties to Interim.  (Def.'s R. 56.1 Statement Reply ("Def.'s 56.1 Reply"), Dkt. 115-1 ¶ 175.)  In July 2017, Community Care began exploring the possibility of purchasing the Watson Franchises.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 9.)

---

[4] Specifically, Watson served as the Chief Executive Officer of two companies, J&P Watson, Inc. d/b/a Interim Healthcare of Greater New York ("GNY") and Interim Healthcare of Rochester, Inc. d/b/a Interim Healthcare of Western New York ("WNY") (collectively, the "Watson Franchises").  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 6.)  Though sometimes the record evidence refers only to "GNY and WNY," the Court uses "GNY and WNY" and "Watson Franchises" interchangeably.

[5] The Watson Franchises serviced the following counties: Rockland, Sullivan, Orange, Suffolk, Nassau, Westchester, Putnam, Dutchess, Livingston, Monroe, Ontario, Steuben, Queens, Wayne, Erie, Genesee, Niagara, Bronx, and Ulster.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 7.)

[6] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[7] The parties do not dispute that the NY AG also communicated with the Watson Franchises around two years later regarding a seemingly separate matter, i.e., on April 4, 2018, the NY AG's Medicaid Fraud Control Unit requested the production of "patient files" for Medicaid recipients from one of the Watson Franchises.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 77.)

### A.    Pre-Purchase Disclosures Made to Community Care

In July 2017, Interim provided Community Care with a Franchise Disclosure Document, which did not include any projections of earnings or revenues with respect to the Watson Franchises.  (Def.'s 56.1 Reply, Dkt. 115-1 ¶¶ 233–34.)  Around the same time, Interim shared with Community Care an independent audit report conducted by Marcum Accounts and Advisors ("Marcum Audit"), which audited the combined financial statements of Interim and its affiliates, including the Watson Franchises.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 17–18.)  The Marcum Audit report stated, *inter alia*, that, "the Company [Interim and its affiliates] suffered significant losses from operations during the year ended December 30, 2016, and is considering selling its operations.  These issues raise substantial doubt about the Company's ability to continue as a going concern."  (*Id.* ¶ 19.)  The report further highlighted that Interim's liabilities exceeded its assets and showed that, in 2016, the Watson Franchises ran a net income loss of $3,462,634 and had a negative cash flow of $9,916.  (*Id.* ¶¶ 22–23, 25.)   On July 19, 2017, Michael Slupecki ("Slupecki"), Interim's former Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"), emailed Third-Party Defendant Caro (Community Care's President) an operational assessment prepared by Blacktree Healthcare Consulting (the "Blacktree Assessment"), which identified various "process issues" faced by the Watson Franchises.  (*Id.* ¶¶ 5, 11, 29, 31; *see also* Def.'s 56.1 Reply, Dkt. 115-1 ¶ 196.)  Community Care's leadership thoroughly reviewed both the Marcum Audit report and the Blacktree Assessment report before entering into the franchise deal with Interim.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 32.)

In August 2017, Interim—via its former Chief Executive Officer ("CEO"), Larry Kraska ("Kraska"),—further disclosed income statements and financial summaries for the Watson Franchises for 2016, and the first quarter of 2017, viewed by Caro and Community Care's accountant Ralph Cerullo ("Cerullo"), showing generally negative net incomes for the several

locations operated under the Watson Franchises.  (*Id.* ¶¶ 37–41; *see also id.* ¶ 33 (identifying Kraska as former CEO of Interim), *id.* ¶ 34 (identifying Cerullo as Community Care's accountant).)  Kraska also sent to Community Care a document called "Personal and Non-recurring Expense Schedule" for the Watson Franchises, viewed by Caro, Gatien (Community Care's Vice President), and Cerullo, showing that the Watson Franchises spent over $600,000 on "personal expenses" in 2016 and around $290,000 on the same in 2017.  (*Id.* ¶¶ 33–34, 36; *see also id.* ¶ 4 (identifying Gatien as Community Care's Vice President).)  On August 3, 2017, Slupecki sent Caro and Gatien a spreadsheet entitled "New York Franchise Structure Proposal," which set forth a "Royalty Structure" and "Royalty Model" based on historical royalties earned by Interim from the Watson Franchises.  (*Id.* ¶ 44; 8/3/2017 Email, Dkt. 110-24 at ECF 6 (showing "Royalty Model" with a note stating "2016 Historical Royalty Comb").)  On August 24, 2017, Slupecki sent Caro and Gatien a spreadsheet setting forth a royalty structure for the first three years and a proposed "royalty credit" for the second and third years of operation of the Watson Franchises, based on sample data from 2016.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 46–48; 8/24/2017 Email, Dkt. 110-25.)

There are several disputed facts between the parties that relate to Interim's disclosure of the financial documents ahead of Community Care and Interim entering into the contract relating to the Watson Franchises.  First, the parties dispute whether Defendant ever advised Plaintiff that there was no time to conduct a normal due diligence process.  Caro testified in his deposition that, although Kraska did not explicitly instruct Community Care not to conduct any due diligence, Kraska told Caro that "the timing was urgent," that "[Community Care] didn't have months to do a normal due diligence[,] . . . and that they [Interim and its affiliates] would provide all the information for due diligence directly to [Community Care]."  (Caro Dep., Dkt. 111-8 at 101:20–

102:7.)  Interim, meanwhile, disputed that Kraska told Caro that Community Care did not have the time to do a normal due diligence, claiming that "Caro repeatedly acknowledged . . . that no one at Interim told Community Care not to conduct its own due diligence."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 236.)

Second, the parties disagree as to whether the personal expenses spreadsheet and the royalty documents provided to Plaintiff were "projections of earnings."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶¶ 268, 270–74.)  Specifically, Plaintiff asserts that prior to signing the agreements, Defendant led Plaintiff to believe, "based on the pro forma [i.e., income statements and financial documents provided to Community Care] and the communications from Slupecki" that Plaintiff "could achieve profits of $3 million annually based on eliminating expenses and consolidations." (*Id.* ¶ 264; *see also* Gatien Dep., Dkt. 111-1 at 154:20–155:15 (explaining that, based on the numbers in the Marcum Audit report, once Watson was replaced, "a lot of expenses . . . would be eliminated based on [Plaintiff] acquiring the business")).)[8]  Further, Plaintiff argues that the royalty documents it received were projections of earnings because "one could back into the sales or earnings by using the formulas Interim provided on what the franchise fees would be."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 271; *see also* Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 44, 46; 8/3/2017 Email, Dkt. 110-24; 8/24/2017 Email, Dkt. 110-25.)  Defendant maintains that the "royalty models did

---

[8] Community Care further asserts—citing only to Caro's Declaration—that Interim failed to disclose that Watson had not been paying royalties for approximately two years, which made the royalty spreadsheet Plaintiff received misleading.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 275 (citing Decl. of Alexander J. Caro, Dkt. 111-69 ¶ 4).)  But without any supporting evidence, such a statement in a declaration is merely a "conclusory allegation[] in affidavit form," which the Court disregards in determining whether there exist genuine issues of disputed fact for trial.  *United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005), *aff'd sub nom. United Mag. Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) (summary order); *see also Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.") (citation omitted).

not provide a representation of estimated earnings or revenue" because "the purpose of the royalty models was to show how the proposed royalty structure would mechanically work using the sample data from 2016." (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 48 (citation omitted).)

Third, though Plaintiff does not dispute that the Marcum Audit report disclosed Watson's debts to third parties—including a total remaining liability of $1,642,048 that accounted for settlement agreements with the New York State Workers Compensation Board in 2014 and 2016, the potential return of revenue to Medicaid, and a $6,000,000 bank debt—Plaintiff nevertheless asserts that there existed an understanding between the parties that Plaintiff ultimately would not be responsible for those debts. (*Id.* ¶¶ 26–28.) According to Plaintiff, Defendant "[told Community Care] that it would not be responsible for Watson debts because Interim and [the license consulting agency Pinnacle Health Consultants, LLC ("Pinnacle")] would be able to promptly obtain licenses for [Community Care]." (*Id.*) In other words, once Community Care acquired the Watson Franchises and was properly licensed (under Interim's name), Community Care would not be responsible for Watson's debts. (*See* Def.'s 56.1 Reply, Dkt. 115-1 ¶ 353 ("Had [Interim gotten the licenses], [Community Care] would not have been burdened with Watson's expenses.") (citation omitted).) This is because Interim believed that "if a new license were not obtained, a purchaser could become liable for Medicare, Medicaid, or other debts of the seller, here the Watson Companies" and that "[t]o avoid successor liability, you have to get a new license." (*Id.* ¶ 187; Dep. Tr. of Derik Reynecke ("Reynecke Dep."), Dkt. 111-2, at 32:6–14.)[9]

---

[9] Defendant disputes the admission of Derik Reynecke ("Reynecke")'s testimony, arguing that it is not supported by admissible evidence and "was in response to a question that impermissibly asked a lay witness to offer a legal conclusion." (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 187.) Reynecke is the CFO of Interim. (Reynecke Dep., Dkt. 115-8 at 10:6–15.) The Court overrules these objections because his testimony is evidence of Interim's beliefs about the importance of acquiring new licenses to avoid Watson's liabilities at the time, and thus does not constitute a legal conclusion.

### B.    Agreements Between the Parties

On October 13, 2017, Plaintiff and the Watson Franchises entered into an "Agreement for Purchase and Sale" ("PSA") of the Watson Franchise locations.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 63.)  The PSA stated, *inter alia*, that "Seller [Watson Franchises and Interim] shall retain all its liabilities and obligations" and that the "Buyer [Community Care] shall not be a successor to any liability of Seller." (*Id.* ¶¶ 63–65.)  At his deposition, Caro testified, that despite this provision, Community Care paid some of Watson's liabilities—including "about 10 or 12 specific items that were charged to [Community Care]," such as "insurance, Worker's Comp premiums, [and] different debts that [Watson] had." (Caro Dep., Dkt. 111-8 at 138:23–139:7[10]; *see also* Def.'s 56.1 Reply, Dkt. 115-1 ¶ 352.)[11]  Caro further testified that Community Care's obligations to pay Watson's liabilities were related to the procurement of new licenses for Community Care: "Had [Interim] done that [i.e., acquired licenses within the promised time period], [Community Care] would not have been burdened with Watson's expenses.  [Watson] would have closed up his corporations, gone away." (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 353 (citation omitted).)  The PSA also

---

[10] Defendant disputes the admission of this statement, arguing that it is not supported by evidence of "specific liabilities and obligations," but the Court holds that Caro's testimony, listing the types of liabilities, is sufficiently specific.  (*See* Caro Dep., Dkt. 111-8 at 138:23–139:7.)  Further, Defendant's argument that the statement is inadmissible because Caro's testimony was "in response to a question that impermissibly asked a lay witness to offer a legal conclusion in violation of Fed. R. Evid. 701" is inapposite.  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 354.)  Caro's testimony was factual and focused on whether Community Care paid for Watson's liabilities.

[11] Defendant disputes that "Community Care was forced to pay liabilities and obligations of the Watson Companies," stating that Plaintiff "negotiated a right of indemnity for these payments in the PSA with Watson but later elected not to pursue reimbursement from Watson and released these contractual protections." (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 352.)  The Court notes, however, that the agreement containing the indemnification clause was not entered into until July 29, 2020, almost three years *after* the PSA was signed in 2017.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 63, 78.)  In any case, the parties do not dispute that it was Community Care who paid the liabilities since it was deciding whether to "pursue reimbursements from Watson." (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 352.)

contained a provision that Community Care would pay the Watson Franchises $10,000 for acquiring its assets; that amount was never paid.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 67–68.)

On October 14, 2017, the Watson Franchises and Community Care entered into a "Management Services Agreement," ("MSA") which gave Plaintiff the "operating and management authority over the [Watson Franchises]." (*Id.* ¶¶ 58–59.)  The same day, Plaintiff and Defendant entered into seven separate but identical franchise agreements ("Franchise Agreements"),[12] each of which stated, *inter alia*, "that no claims, representations or warranties regarding the earnings, sales, profits, success, or failure of the Franchise Business have been made to Franchisee, and no such claims, representations[,] or warranties have induced Franchisee to enter into this Agreement."  (*Id.* ¶ 60.)  The Franchise Agreements, *inter alia*, did not allow Community Care to operate in Queens since Interim already had another franchise in that territory. (*Id.* ¶ 158; *see also* Caro Dep., Dkt. 111-8 at 238:14–19.)  Moreover, Section 19.6 of the Franchise Agreements provided that "[Interim] will not establish and . . . will not authorize . . . any other person or firm to establish . . . an office within the Authorized Area for the purpose of providing the services which [Community Care] is authorized to provide."  (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 107.)

Further, on October 14, 2017, Plaintiff and Defendant entered into an "Addendum," which provided for royalty relief, rebranding, and a line of credit.[13]  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 61;

---

[12] These included the Nanuet Franchise Agreement, the Suffolk Franchise Agreement, the Nassau Franchise Agreement, the Westchester Franchise Agreement, the Putnam/Dutchess Franchise Agreement, the Rochester Franchise Agreement, and the Buffalo Franchise Agreement. (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 60.)

[13] Royalty relief refers to the provision in the Addendum stating, *inter alia*, that Community Care would not be required to pay royalties for the first year of operation.  (Addendum, Dkt. 110-32 at 2.).  Rebranding refers to rebranding Community Care's pre-existing businesses as Interim facilities.  (*Id.* at 4.)

*see also* Addendum, Dkt. 110-32.)  Defendant "agreed to provide a $2 million line of credit in the addendum, . . . under certain conditions," including "Caro signing a personal guarantee and [Plaintiff] providing [Defendant] a first priority lien on its assets."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 369.)  The $2 million line of credit was never provided to Plaintiff.  (*Id.* ¶ 381.)  Interim sent Gatien a draft of a guaranty and security agreement related to securing the line of credit, but these agreements were not signed.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 85–86.)  Under the Addendum, the "No Royalty" period of one year—during which Plaintiff did not have to pay Defendant royalties—was set to begin on or about January 1, 2019, and thus end in January 2020.  (*Id.* ¶¶ 142, 144.)  To date, Plaintiff has not paid any royalties to Defendant.  (*Id.* ¶ 152.)  Section 5 of the Addendum further stated that "[a]s a condition to reopening as an Interim Healthcare Franchised Business, . . . [Interim] agrees to provide [Community Care] with $75,000 to be used solely in connection with such re-branding."  (*Id.* ¶ 88.)

Separate from the written agreements, the parties allegedly entered into "several [oral] agreements," pursuant to which Community Care agreed to give up its Queens location and Interim agreed to hire a lobbyist [and consultant] to expedite licensing on behalf of Community Care.  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 277; Caro Dep., Dkt. 111-8 at 238:7–24.)  Though Slupecki (Interim's former COO and CFO), when asked at his deposition about entering into an oral agreement with Caro, testified that he "[did not] know what that means," he also stated that Interim was "arm [in] arm [with Community Care] trying to help navigate the licensure process."  (Slupecki Dep., Dkt. 111-3 at 87:4–88:6.)  Community Care closed its Queens location (Caro Dep., Dkt. 111-8 at 241:11–14), but reopened it in 2023, (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 280).

## C.  The Licensing Process

Once the agreements were signed, Defendant paid a $7,500 retainer for Pinnacle (the licensing consultant) in order to start the licensure process for Community Care with the New York

State Department of Health ("NYSDOH").  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 360.)  Pinnacle's letter of engagement, dated December 18, 2017, stated that it was providing "consultative services" to "Interim Healthcare Inc. and Community Care Companions, Inc. d/b/a Interim Healthcare of New York" and was addressed only to Kraska (former Interim CEO).  (*Id.* ¶¶ 356–357; *see also* 12/18/2017 Letter, Dkt. 111-40.)  There is considerable disagreement between the parties as to whether Interim "engaged" Pinnacle's services on behalf of Community Care, or not.

The parties also dispute how long Defendant believed the licensing process would take and what it told Plaintiff about that timing.  Gatien (Plaintiff's Vice President) testified that Defendant told Plaintiff that "they could get the licenses within the first thirty to ninety days."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 292; *see also* Gatien Dep., Dkt. 111-1 at 228:17–229:9 (testifying that Pinnacle contacted him by phone on September 1, 2017, "to plan how [they were] gonna get [Plaintiff's] licenses within the first 90 days")[14].)  Plaintiff also relies on deposition testimony of Slupecki (Interim's former COO and CFO) that "there were representations based upon representations to Community Care that the transfer of licenses would take less than a three-month period," but Defendant disputes the materiality of Slupecki's testimony in part because he "was never asked whether the representations were made to Community Care."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 294 (internal quotation marks omitted)).  Though the parties dispute whether "Interim [actually] believed it would take nine to twelve-months before Community Care was fully licensed to operate" it is undisputed that Interim never conveyed any such belief to Community Care.  (*Id.* ¶¶ 293, 296.)

---

[14] Though Defendant disputes the admissibility of this testimony because Gatien "did not participate in the negotiations" between Plaintiff and Defendant, (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 292), the phone call at issue is based on personal knowledge and hence admissible.

On December 17, 2017, Pinnacle submitted the first application to the NYSDOH on behalf of Plaintiff for licensing of the former Watson Franchises.  (*Id.* ¶ 411.)  The NYSDOH rejected the application on February 9, 2018, and required that two applications be submitted because the Watson Franchises were operated by two companies.  (*Id.* ¶ 412.)  On February 13, 2018, Pinnacle filed the second and third applications for licensing on behalf of Plaintiff.  (*Id.* ¶ 414.)  On April 1, 2018, the NYSDOH issued a two-year moratorium on the processing and approval of applications seeking the licensure of LHCSAs.  (*Id.* ¶ 415.)  On May 17, 2018, Pinnacle was advised by the NYSDOH that the second and third applications were being marked withdrawn due to the moratorium.  (*Id.* ¶ 416.)  On May 30, 2018, under an exception to the moratorium, Pinnacle filed a fourth application for licensing to the NYSDOH on behalf of Plaintiff (the "Merger Application").  (*Id.* ¶ 417.)  The "Certificate of Assumed Name" submitted in connection with the Merger Application states that the Assumed Name should be "Interim Healthcare of NY." (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 124.)  On June 1, 2018, the Director of the [NYSDOH] Bureau of Project Management sent acknowledgement of its receipt of the Merger Application to Pinnacle. (*Id.* ¶ 125.)  A subsequent Bureau of Project Management staff report about the application noted, *inter alia*, that "Community Care Companion, Inc proposes to operate as a Franchisee of Interim Healthcare, Inc.," and recommended contingent approval of the application.  (*Id.* ¶¶ 126, 129–30.) The [New York State] Public Health and Health Planning Council's ("PHHPC") Committee on Establishment and Project Review ("CEPR") reviewed the staff report and recommended contingent approval of the application on July 19, 2018.  (*Id.* ¶ 131.)  On August 2, 2018, PHHPC entered a resolution to contingently approve the Merger Application.  (*Id.* ¶ 132–35.)  The approval was "contingent upon," "[a] copy of the bylaws of the applicant, which is acceptable to the Department" and "[a] copy of the franchise agreement of the applicant, which is acceptable to the

Department." (*Id.* ¶ 135.)  On August 7, 2018, the Franchise Agreements and by-laws entered into by the parties were uploaded to NYSDOH's portal.  (*Id.* ¶ 141; *see also id.* ¶ 136 (explaining that responses to contingencies must be entered "via the . . . NYSE-CON[] system" under the Contingencies Tab).)

On October 12, 2018, Rebecca Gray ("Gray"), the Director of the [New York State] Division of Home and Community Based Services, sent a letter to Gatien noting that "all legal contingencies associated with this application have been satisfied by Community Care Companions as of August 8, 2018"and that "a license will be issued that reflects all approved services and the geographical service area to be served by each office." (*Id.* ¶¶ 146–47.)  The NYSDOH issued Plaintiff new LHCSA licenses dated November 20, 2018.  (*Id.* ¶ 148.)  The licenses, however, did not have the name "Interim Healthcare of NY"—rather, they were made out to "Community Care."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶¶ 428–29.)  The parties therefore dispute whether Community Care was ever issued licenses to operate as an Interim franchise.

### D. Events After the Licenses Were Issued

Plaintiff asserts that because the new LHCSA licenses were not issued in Interim's name, "Community Care was subsequently cited by [NYS]DOH and told that it could not operate under the Interim name because its licensure was in the name of Community Care." (*Id.* ¶ 429.)  Plaintiff continues to operate a website called www.communitycarehhs.com which does not "acknowledge any connection with Interim." (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 155.)  Plaintiff did not rebrand any of its existing locations to "Interim Healthcare," and any rebranding that did occur was "switched back" to Community Care's name.  (*Id.* ¶¶ 90, 92; *see also* Caro Dep., Dkt. 110-8, at 249:10-23.)  Further, in 2023, Plaintiff reopened a location in Queens, which is not an "[A]uthorized [A]rea" under the Franchise Agreements.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 157–58.)

On July 22, 2019, Interim sent a letter to Community Care describing its alleged breaches of the Franchise Agreements.  (*Id.* ¶ 164.)  On July 29, 2020, Community Care, the Watson Franchises, and their principals, entered an "Agreement to Hold Harmless and Waiver," that released the Watson Franchises and their principals from all liability arising from the PSA. (*Id.* ¶ 78.)[15]

## II.    Procedural History

Plaintiff initiated this action on August 26, 2019. (Compl., Dkt. 1.)  Plaintiff filed its Amended Complaint on October 14, 2019.  (Am. Compl., Dkt. 7.)  On April 27, 2020, Plaintiff filed its Second Amended Complaint ("SAC"), which is the operative complaint in this action. (SAC, Dkt. 29.)  Defendant moved to dismiss this action in August 2020.  (Mot. to Dismiss, Dkt. 36.)  On January 19, 2021, the then-presiding district judge, the Honorable Denis Hurley,[16] issued an order granting in part and denying in part Defendant's motion to dismiss.  (Mem. & Order Mot. to Dismiss ("Dismissal M&O"), Dkt. 37); *see also Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*, No. 19-CV-4870 (DRH) (SIL), 2021 WL 12102892 (E.D.N.Y. Jan. 19, 2021).  Following Judge Hurley's Order, the only surviving causes of action in Plaintiff's SAC were Count II (violation of New York General Business Law ("NY GBL") § 683), Count III (violation of NY GBL § 687), Count V (breach of contract), and Count VII (breach of fiduciary duty).  (*See generally id.*)

---

[15] Plaintiff contends that it signed the agreement because it "believe[ed] Watson was judgment proof" and "so [that] Watson would leave the bank account open and transfer funds until Community Care could get the Medicaid billing numbers and contracts out of Watson's name, which had to follow license issuance." (Def.'s 56.1 Reply, Dkt. 115-1 ¶¶ 435–436 (citing Decl. of Mark Gatien, Dkt. 111-70 ("Gatien Decl."), ¶ 12).)  But as explained *supra* n.8, these are conclusory statements contained in an affidavit that are not sufficient to create a genuine dispute of material fact and will therefore be disregarded by the Court.

[16] This case was reassigned to the undersigned on July 8, 2022.  (7/8/2022 Min. Entry.)

On March 5, 2021, Defendant answered the SAC along with the Third-Party Complaint against Community Care and Third-Party Defendants Gatien and Caro.  (Ans. with Counterclaims & Third-Party Compl. ("TPC"), Dkt. 40.)  Plaintiff and Third-Party Defendants answered the TPC on May 21, 2021.  (Ans. to TPC, Dkt. 54.)  The parties had an initial conference before the Honorable Steven I. Locke, Magistrate Judge, on December 2, 2021, following which discovery deadlines were set.  (*See* 12/2/2021 Min. Order, Dkt. 64; Scheduling Order, Dkt. 65.)  The case was stayed in September 2022 for 90 days pending settlement discussions.  (9/23/2022 Dkt. Order.)  The case was then stayed for an additional 60 days so that parties could proceed to mediation.  (1/17/2023 Dkt. Order.)  In their status report filed on May 12, 2023, the parties jointly noted that mediation had been unsuccessful.  (5/22/2023 Status Report, Dkt. 82.)  On April 4, 2024, the parties confirmed that discovery was complete.  (*See* 4/10/2024 Min. Order, Dkt. 97.)

Thereafter, Defendant filed two letters seeking a pre-motion conference for an anticipated motion for summary judgment and an anticipated motion to preclude the expert testimony of Frank Cicero, (Letter Mots., Dkts. 98–99), to which Plaintiff responded, (Resp. Opp'n, Dkts. 100–101). On May 14, 2024, the Court denied Defendant's pre-motion conference request as unnecessary, and the parties proceeded to briefing the motions.  (5/14/2024 Dkt. Order.)

Subsequently, on June 13, 2024, Defendant moved for summary judgment on Counts II, III, V, and VII of Plaintiff's SAC, as well as Counts I, III, and VI of Defendant's TPC.[17]  (Def.'s Mem. L. Supp. Summ. J. ("Def.'s MSJ Mem."), Dkt. 110-1 at 1.)  In the same filing, Defendant moved to strike the report of Plaintiff's expert Roy Breitenbach.  (*Id.*)  Plaintiff and Third-Party

---

[17] Defendant did not seek summary judgment on Counts II (Breach of Contract against Gatien and Caro), IV (Fraud against Gatien, Caro, and Does 1–10), and V (Unjust Enrichment against Community Care) of its Third-Party Complaint.  Nor did Plaintiff.  Those counts will therefore proceed to trial.

Defendants responded with their opposition brief on July 29, 2024.  (Pl.'s Mem. L. Opp'n Summ. J. ("Pl.'s MSJ Opp'n"), Dkt. 111-71.)  Defendant replied, and the summary judgment motion, as well as the motion to strike Roy Breitenbach's report, were fully briefed, on August 29, 2024. (Def.'s Reply ("Def.'s MSJ Reply"), Dkt. 115.)

Separately, on June 13, 2024, Plaintiff filed a motion to strike the report of Defendant's expert Frank Cicero.  (Pl.'s Mem. L. Supp. Mot. Strike ("Pl.'s Mem. Strike"), Dkt. 112-5.) Defendant responded with its opposition brief on July 29, 2024.  (Def.'s Mem. L. Opp'n Mot. Strike ("Def.'s Opp'n Strike"), Dkt. 113.)  Plaintiff replied, and the motion to strike Frank Cicero's report was fully briefed, on August 29, 2024.  (Pl.'s Mem. Reply Mot. Strike ("Pl.'s Reply Strike"), Dkt. 116.)  The same day, Plaintiff moved for oral argument on the pending motions.  (Mot. for Hr'g, Dkt. 117.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (explaining that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis original).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence in support of the" nonmoving party is "insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted) (alteration in original); s*ee also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (explaining that a plaintiff must "show more than 'some metaphysical doubt as to the material facts'" to survive summary judgment (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

## DISCUSSION

### I.    The Parties' Cross-Motions to Strike Expert Reports

Where a decision on a motion to strike might affect a movant's ability to prevail on summary judgment, it is appropriate to consider the strike motion before the summary judgment motion. *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S de R L de C.V.*, 627 F. Supp. 3d 408, 415 (S.D.N.Y. 2022). Here, the parties' respective experts have opined on the LHCSA licensure process generally, the legal effect of correspondence between Community Care and the NYSDOH, and whether and when Community Care received approval for the Management Services Agreement and the Franchise Agreements. (*See generally* Expert Report

of Frank Cicero ("Cicero Report"), Dkt. 112-2[18]; Expert Report of Roy Breitenbach ("Breitenbach Report"), Dkt. 110-84.)  Each side has moved to strike the other side's expert report and preclude the expert's testimony.  Because the resolution of the parties' respective motions to strike could affect Defendant's motion for summary judgment, the Court rules on the strike motions first.

### A.  Legal Standard

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . :
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying the gatekeeping obligation to scientific testimony in addition to "technical" or "other specialized" knowledge).  This is a necessarily "flexible" inquiry.  *Id.* (quoting *Daubert v. Merrell*

---

[18] Frank Cicero ("Cicero") submitted two reports, an original dated December 22, 2023, (Dkt. 112-4), and a supplemental dated March 5, 2024, (Dkt. 112-2).  Cicero's March 5, 2024, report "repeats the December 22, 2023[,] report in its entirety, with slight modifications," adding only "two additional pages."  (Pl.'s Mem. Strike, Dkt. 112 at 1.)  Accordingly, the Court considers the March 5, 2024, report to be the operative expert report and refers to it as the "Cicero Report."

*Dow Pharms. Inc.*, 509 U.S. 579, 597 (1993)).  "Important to this inquiry is that a district court 'focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.'"  *Kurtz v. Kimberly-Clark Corp.*, 414 F. Supp. 3d 317, 330 (E.D.N.Y. 2019) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57 (2d Cir. 2020) (summary order).

Since the "test for reliability is 'flexible,'" "a trial judge may, but need not, consider the specific factors identified in *Daubert*."  *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (quoting *Kumho Tire Co.*, 526 U.S. at 149).  Those factors include: "(1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community."  *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 149–50); *see also Daubert*, 509 U.S. at 592–94.

## B.    Report of Defense Expert Frank Cicero[19]

Plaintiff moves to strike the report of defense expert Frank Cicero ("Cicero"), submitted on December 22, 2023, and March 5, 2024, in its entirety, and to preclude his testimony at trial.

---

[19] Plaintiff and Third-Party Defendants moved for oral argument on all pending motions in this case, including the parties' cross-motions to strike the expert reports.  (Mot. for Hr'g, Dkt. 117.)  "While courts must exercise their gatekeeper function regarding expert testimony, a separate pretrial hearing is not always required."  *United States v. Diakhoumpa*, 171 F. Supp. 3d 148, 152 (S.D.N.Y. 2016) (citing *Williams*, 506 F.3d at 161); *see also Kumho Tire Co.*, 526 U.S. at 152 ("[A trial court has] discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").  Here, as explained *infra*, the reliability of Cicero's methods—applying knowledge from his own past experience working on two LHCSA applications to the current case—is properly taken for granted.  Further, the Court's reasoning for striking the report of Plaintiff's expert Roy Breintenbach is similarly straightforward—as

(Pl.'s Mem. Strike, Dkt. 112-5 at 1.)    Cicero is the President and majority owner of Cicero Consulting Associates, whose main business is providing Certificate of Need consulting to entities seeking NYSDOH approval to provide healthcare services in New York.    (Cicero Report, Dkt. 112-2 at 1.)  The Court finds that certain portions of the Cicero Report and his anticipated testimony should be precluded, but his opinions that Plaintiff could have easily corrected their licenses and that the LHCSA application timeline occurred in a timely manner should not be precluded.

### 1.    Inadmissible Portions of Cicero's Report and Anticipated Testimony

Starting with the portions of Cicero's report and anticipated testimony that should be precluded, though some of Cicero's conclusions are based on his personal experience dealing with the NYSDOH, most of his other "conclusions" are merely restatements of facts already in the record, conclusions he is not qualified or permitted to make, or recitations of inadmissible hearsay.

First, Cicero concludes that the "NYSDOH would have understood that Community Care commenced operation of the Watson [Franchises] as of the date the [Management Services Agreement] was approved—which occurred no later than May 14, 2018." (*Id.* at 13.)  To support this conclusion, Cicero primarily relies on an email from George Macko ("Macko") on May 14, 2018, "acknowledging approval of [the] MSA," (*id.* at 13 n.40), and a letter from Rebecca Gray on October 4, 2018, doing the same.[20]  (*Id.* at 11–12, 13.)  Though the Court credits Defendant's

---

explained *infra*, there is no question that his only qualification is as a health law attorney and that he advances legal conclusions that are inappropriate for expert testimony.  For these reasons, the Court denies Plaintiff and Third-Party Defendants' request for oral argument as unnecessary.

[20] The email from Macko dated May 14, 2018, (*see* Cicero Report, Dkt. 112-2 at 13 n.40 (citing to a document with Bates Stamp NYSDOH_000000043)) and October 4, 2018, letter from Gray, (*see id.* at 12 n.35 (citing to a document with Bates Stamp NYSDOH_0000019)), have not been submitted with the parties' briefing, but were produced in discovery.  The Court assumes without deciding that these communications, relied upon by both sides, would be admissible at trial and that the Court can therefore consider them in resolving the pending motions.  *Seife v.*

assertion that submitting license applications to the NYSDOH is a "Byzantine process" that typically requires specialized knowledge, (Def.'s Opp'n Strike, Dkt. 113 at 7), Cicero's "conclusion" that the NYSDOH "would have understood" that the MSA was in effect by May 14, 2018, is based solely on the contents of the May 14 email and October 4 letter, neither of which is augmented or explained in any way by Cicero's specialized knowledge about the workings of the NYSDOH.  Rather, whether the NYSDOH knew or "would have understood" that the MSA was in effect by May 14, 2018, is a factual question for the jury to decide based on the evidence presented at trial and the inferences to be drawn from that evidence.  This is not a matter of expert opinion.

Second, Cicero's "opinion" that "not only did Community Care receive approval to operate as an Interim franchise, but [it] was obligated to do so" is, in part, simply  a restatement of facts in the record—including, *inter alia*, the submission of the Merger Application, the Bureau of Project Management staff report recommending contingent approval, and the Gray letter from October 4, 2018, stating that all contingencies had been resolved—as to which no expert testimony is needed. (Cicero Report, Dkt. 112-2 at 14–15, 15 n.47.)  And, in part, this is an issue that the jury, not an expert, must resolve—i.e., whether Community Care was "obligated" to operate as an Interim franchise under the contracts at issue—based on the jury's assessment of the facts after being instructed on the applicable law by the Court.  Again, this portion of Cicero's report is not proper expert opinion.

---

*Food & Drug Admin.*, No. 17-CV-3960 (JMF), 2019 WL 1382724, at *1 (S.D.N.Y. Mar. 27, 2019) ("Whether or not a motion to strike is filed, '[o]n a motion for summary judgment, a district court may rely only on material that would be admissible at trial.'" (alteration in original) (quoting *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004))).

Third, Cicero appears to opine that Community Care could operate under the Interim name, despite the fact that the licenses were issued in Community Care's name only.  But this "opinion" is based solely on Cicero's interpretation of a NYSDOH "Statement of Deficiencies" letter[21] sent to Community Care on or about August 21, 2020.  (*Id.* at 16.)  Although Plaintiff claims that the letter "cited" Community Care for using the Interim name, (*see* Def.'s 56.1 Reply, Dkt. 115-1 ¶ 429), Cicero opines that the letter was simply an instance where "the Regional Office observed that a name on a single policy was not the name it expected to see and required that the policy be changed, [and not] an affirmative[] stat[ment] that Community Care cannot use the [Interim] name," (Cicero Report, Dkt. 112-2 at 16).  Again, Cicero comes to this conclusion by simply summarizing the contents of the letter—what it said and did not say—without applying purported industry knowledge or past experience with similar letters in a way that would assist a jury in interpreting that evidence at trial.[22]  The inferences to be drawn from this letter is a factual issue for the jury to decide.  In addition, Cicero's view that Community Care was permitted to operate under Interim's name is also a legal conclusion that Cicero is not qualified to make.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

Because these three portions of Cicero's expert report and his anticipated testimony on these issues either "address[] 'lay matters which a jury is capable of understanding and deciding

---

[21] This document was produced as part of discovery but not attached to the briefing. (Cicero Report, Dkt. 112-2 at 16 n.51 (citing document with Bates Stamp Community Care 00027702).)

[22] Further, Cicero's assertion that "any failure by Community Care to comply with the conditions for approval of its licenses could be conceived of as 'fraud or deceit in procuring such approval,'" (*id.* at 15 (citing 10 NYCRR §765-1.8(a)(1))), is a legal conclusion that is inappropriate for expert testimony and does not speak to the topic at hand, i.e., whether the NYSDOH approved Community Care to operate as an Interim franchise.  *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

without the expert's help,'" or constitute legal conclusions, they are inadmissible.  *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)); *Hygh*, 961 F.2d at 363.  Accordingly, the Court grants Plaintiff's motion to strike these three portions of the Cicero Report and anticipated testimony.[23]

Fourth, Plaintiff seeks to preclude Cicero from offering expert testimony based on his conversations with state agency officials.  In the supplemental portions of the Cicero Report, he adds details of various communications he had with current and former NYSDOH officials and attorneys who supervise the LHCSA application process, who "confirmed [Cicero's conclusion] that Community Care received approval to operate as an Interim franchise."  (Cicero Report, Dkt. 112-2 at 18.)  In addition, Cicero states that the Director of the New York State ("NYS") Bureau of Home Care Licensure, Chris Squillacioti, speaking in a Zoom conference call in which Cicero participated, "explained that [Community Care's name on the license] was an 'error,' and expressed surprise that, Community Care did not contact NYSDOH to fix this error."  (*Id.*)  Cicero further states that he had a call with Gray, who stated that "the October 4, 2018 approval letter" Gray sent regarding the MSA "would have been sent to Community Care," "agreed with [Cicero] that Community Care's Merger Application was approved so that it could operate as an Interim

---

[23] Plaintiff also seeks to strike the Factual Background section of the Cicero Report.  While an expert may lay a factual foundation for his or her opinion, *see Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266–67 (2d Cir. 2002), Cicero's Factual Background section contains his own conclusions interspersed with factual statements from the record.  This includes, for example, his assertions that "no later than May 14, 2018, the NYSDOH approved the MSA" and "based upon [his] experience, the approval of the requisite paperwork [for the Merger Application] would have been perfunctory."  (Cicero Report, Dkt. 112-2 at 5, 10.)  Although the Court will permit both sides' experts to testify about the factual *assumptions* they relied upon in forming their opinions, the Court will not allow either expert to "opine" that any fact has been proved.

franchise," and explained that "there would have been no separate letter approving the Franchise Agreement because the Franchise Agreement was merely part of a larger project to approve the Merger Application." (*Id.* at 18–19.)

"Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citation omitted); *see also FloodBreak, LLC v. Art Metal Indus., LLC*, No. 18-CV-0503 (SRU), 2020 WL 6060974, at *8 (D. Conn. Oct. 13, 2020) (same). Here, Defendants seek to have Cicero testify about these hearsay conversations to support his conclusions that (1) the NYSDOH approved the Merger Application, allowing Community Care to operate as an Interim Franchise, (2) Community Care's name on the license was an error, and (3) the NYSDOH approved the MSA between Community Care and Watson. But none of these conclusions constitute an expert opinion; rather, they are inadmissible hearsay masquerading as expert opinion. The Court has already deemed that these conclusions in the Cicero Report should be struck from his expert testimony because they are not based on specialized knowledge, and the additional hearsay evidence that Cicero offers now does nothing to change this conclusion.

Defendant argues that these portions of the Cicero Report are not merely a conduit for hearsay because Cicero's conversations with NYSDOH officials were "closely tied to the formation of [Cicero's] opinions" and "serve[d] as confirmation" of his own separate findings. (Def.'s Opp'n Strike, Dkt. 113 at 15–16). But these statements from NYSDOH officials, even if they were to be included, would likely require no further synthesis or interpretation by Cicero. Instead, they would be presented to the jury verbatim through Cicero's testimony as confirmation for conclusions that he does not otherwise use any specialized knowledge to reach. *See, e.g.*,

*United States v. Torres*, No. 20-CR-0608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021) (allowing expert testimony when it "will involve the synthesis and interpretation of [qualitative] statements, rather than the mere conveyance of those statements to the jury"), *aff'd*, No. 21-2665, 2023 WL 378942 (2d Cir. Jan. 25, 2023) (summary order).  Since Cicero's testimony would merely relay the officials' statements to the jury, rather than synthesize or interpret those statements, this portion of the Cicero Report is inadmissible hearsay.  For these reasons, the Court grants Plaintiff's motion to strike these portions of the Cicero Report.

2.    Admissible Opinion Testimony by Cicero

Cicero reaches two conclusions in his report to which he can properly testify at trial, because they are based on his own experience obtaining licenses from the NYSDOH through the LHCSA application process.  First, Cicero opines that Community Care was not "prevented" from operating as an Interim franchise by the NYSDOH because changing the license name is a straightforward and easy procedure, and Community Care therefore could have easily changed the name on the license to Interim.  (Cicero Report, Dkt. 112-2 at 15–17.)  Specifically, Cicero states that:

> Community Care could have easily requested a correction to the operating licenses so that the licenses use the name Interim Healthcare of New York without running afoul of the Moratorium.  Community Care simply had to submit a request to NYSDOH at LHCSA@health.ny.gov.  As documentary support, Community Care would attach its own request in the Merger Application to use the name "Interim Healthcare of New York," along with the Staff Report, NYSDOH's August 7, 2018[,] approval letter, and the PHHPC resolution, all of which reflect the same.  In my experience, after receiving this documentation, NYSDOH will correct such errors in as little as ***one day***.

(*Id.* at 16 (citations omitted) (emphasis in original).)

Second, Cicero opines that the NYSDOH approval of the Merger Application in a little over two months "occurred at a very fast pace," as compared to the four-to-five months it took for getting approvals in the two LHCSA change-of-ownership applications that his firm has previously

assisted with.  (*Id.* at 17.)  Plaintiff argues that "there is no methodology to support [Cicero's] findings and conclusions.  He merely summarizes evidence in the same way a jury will have to, and he draws from his own inferences to arrive at what he believes must have happened."  (Pl.'s Mem. Strike, Dkt. 112-5 at 16.)  The Court disagrees.

"A non-scientific expert may rely on *experience* to assess facts."  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, MDL No. 1358 (SAS), 2008 WL 1971538, at *8 (S.D.N.Y. May 7, 2008) (emphasis in original); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  Here, Cicero relies on his own experience seeking approval of two LHCSA licenses to opine that Community Care's process "occurred at a very fast pace" and that if Community Care had requested a name change for its license, the NYSDOH would have corrected that error and has done so in other instances, "in as little as one day."  (Cicero Report, Dkt. 112-2 at 16–17.)  To the extent that Plaintiff seeks to challenge Cicero's testimony on these two conclusions, "[a]rguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony."  *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011) (citation omitted).  Accordingly, the Court denies Plaintiff's motion to strike Cicero's expert testimony that, based on his experience in the field, Community Care could have easily requested a correction to the operating licenses issued in its name and that the LHCSA application process occurred in a timely manner.

*     *     *

In sum, the Court denies Plaintiff's motion to strike Sections II(C)(2)–(3) of the Cicero Report, which contain Cicero's anticipated testimony regarding whether Community Care could

have easily requested a correction to the operating licenses issued in its name and whether the

LHCSA application process was timely.  The Court grants Plaintiff's motion to strike all other

sections of the Cicero Report, as to which Cicero will not be permitted to testify at trial.

### C.   Rebuttal Report of Plaintiff's Expert Roy Breitenbach

Defendant also moves to strike rebuttal report of Plaintiff's expert Roy Breitenbach

("Breitenbach") pursuant to Federal Rule of Evidence 702.  Defendant argues that Breitenbach is

an impermissible expert because his "only relevant experience is his 30+ years as a litigation

attorney." (Def.'s MSJ Mem., Dkt. 110-1 at 39 (emphasis removed).)  Further, Defendant argues

that each of Breitenbach's conclusions "turns on his legal interpretation of New York statutes,

regulations, and the MSA" between Plaintiff and the Watson Franchises.  (*Id.*)  The Court agrees.

Breitenbach, a health law attorney who has previously represented Community Care in

actions against the NYSDOH, offers three opinions in his report.  (*See* Breitenbach Dep., Dkt. 110-

67, at 34:5–39:2; *see also* Breitenbach Report, Dkt. 110-84 at 5.)  First, Breitenbach concludes that

the NYSDOH never approved the MSA between Plaintiff and the Watson Franchises because the

NYSDOH regulations governing management service agreements require "prior written consent"

of such agreements by the NYSDOH Commissioner, and the evidence here does not establish that

consent.  (*Id.* at 8–10 (pointing to NYSDOH_0000043, the May 14, 2018, "internal email" from

Macko and October 4, 2018, letter from Gray as demonstrating "lack of clarity as to whether,

when, and to what extent the management agreement was approved [by the NYSDOH] and

whether that approval was consistent with the regulatory requirements set forth in 10 N.Y.C.R.R.

§ 766.9").)

Second, Breitenbach asserts that, assuming *arguendo* the MSA received express approval

from the NYSDOH Commissioner, Community Care would still not be able to operate as an

Interim franchise, because New York regulations provide that "any powers not delegated

specifically to the managing authority [i.e., Community Care] through the provisions of the contract remain with the governing authority," [i.e., Watson]. (*Id.* at 10–11 (quoting N.Y. Comp. Codes R. & Regs. tit. 10, § 766.9(m)(2)(ii)).) Breitenbach also asserts that "nothing in" article 2 of the MSA, which "sets forth the 'Rights and Responsibilities of'" Community Care gave "any authority to Community Care to enter into any franchise agreement." (*Id.* at 11.)

Lastly, Breitenbach concludes that Community Care did not have legal authority to operate as an Interim franchise even after its acquisition of the Watson Franchises was approved. (*Id.* at 12–14.) This is because, similar to management service agreements, NYSDOH regulations require franchise agreements to be expressly reviewed and approved by the NYSDOH Commissioner and there was no such express approval here. (*Id.* at 12 (quoting N.Y. Comp. Codes R. & Regs. tit. 10, § 766.9(n)(2)).)

The Court agrees with Defendant that Breitenbach's conclusions amount to a "would-be [legal] brief masquerading as an expert opinion," which is squarely inappropriate for expert testimony. (*See* Def.'s MSJ Mem., Dkt. 110-1 at 40 (quoting *246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*, No. 09-CV-0889 (NGG) (JMA), 2011 WL 13254283, at *6 (E.D.N.Y. Apr. 1, 2011).) Courts exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." *Highland Cap. Mgmt. L.P.*, 379 F. Supp. 2d at 470 (quoting *Roundout Valley Ctr. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004)). Plaintiff's only response—that Breitenbach is a rebuttal expert who would only be called if defense expert Frank Cicero is allowed to testify—is non-responsive at best. (*See* Pl.'s MSJ Opp'n, Dkt. 111-71 at 39–40.) While "an expert might be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function

of instructing the jury." *Ebbert v. Nassau County.*, No. 05-CV-5445 (FB) (AKT), 2008 WL 4443238, at *3 (E.D.N.Y. Sept. 26, 2008) (citation omitted).

Accordingly, the Court grants Defendant's motion to strike the rebuttal expert report and anticipated testimony of Roy Breitenbach in its entirety.

## II.    Defendant's Motion for Summary Judgment as to Plaintiff's Second Amended Complaint

As mentioned above, Defendant moves for summary judgment on the four surviving causes of action in Plaintiff's SAC: (1) Count II (violation of NY GBL § 683); (2) Count III (violation of NY GBL § 687); (3) Count V (breach of contract); and (4) Count VII (breach of fiduciary duty). (*See generally* Def.'s MSJ Mem., Dkt. 110-1 at 1.)  The Court considers each of these counts in turn.

### A.    Plaintiff's Second Cause of Action: NY GBL § 683

Plaintiff alleges that Defendant violated NY GBL Section 683 ("Section 683")[24] by providing Community Care with "representation[s] regarding [its] projected sales and earnings," but not disclosing Interim's "data, methods, and computations" for determining those financial representations and not including any of those representations in the Financial Disclosure Document.  (SAC, Dkt. 29 ¶¶ 52–53, 121–25.)  Defendant seeks summary judgment on the grounds that, under NY GBL Section 684(3)(a)(i) ("Section 684"),[25] franchises like Interim with

---

[24] Section 683(2)(o) states, in relevant part, that a franchisor's "offering prospectus sought to be registered" must include "[a]ny representation of estimated or projected franchisee earnings or income, together with a statement setting forth the data, methods and computations upon which such estimate or projection is based."  N.Y. Gen. Bus. Law § 683(2)(o).

[25] Section 684(3)(a)(i) states, in relevant parts, that "[t]here shall be exempted from the registration provisions of [Section 683] the offer and sale of a franchise if . . . [t]he franchisor has a net worth on a consolidated basis . . . of not less than fifteen million dollars."  N.Y. Gen. Bus. Law § 684(3)(a)(i).

a net worth of at least $15 million are exempt from the reporting requirements of Section 683. Plaintiff does not dispute Defendant's net worth.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 10.)

Though the Franchise Agreements, including the Addendum, are governed by Florida law, (*see, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 104; Addendum, Dkt. 110-32 at 5 (stating that the provisions of the Franchise Agreement, including those related to governing law, apply to the Addendum)), Plaintiff may still allege violations of New York statutes with respect to those agreements.  *See Warman v. Am. Nat'l Standards Inst.*, No. 15-CV-5486 (RA), 2016 WL 3676681, at *3 (S.D.N.Y. July 6, 2016) ("[The] choice-of-law clause [in the contract] applies only to claims sounding in contract and not statutory causes of action.").

In a recent opinion on the exact exemption defense raised by Interim, a court in this District held that "a franchisor who is statutorily exempt from registration [under Section 684] is also excused from providing Plaintiffs with the complete statutory disclosures required by [Section] 683(2)."  *Arizona Fam. Florists LLC v. 1-800-Flowers.com, Inc.*, No. 16-CV-2638 (JMA) (AYS), 2021 WL 4959426, at *2 (E.D.N.Y. Oct. 26, 2021); *see also Dunkin' Donuts, Inc. v. HWT Assocs., Inc.*, 581 N.Y.S. 2d 363, 364 (N.Y. App. Div. 1992) ("Financial information supplied by Dunkin' Donuts proves that it is exempt from the specific disclosure requirements of [NY GBL Section] 683, and was thus not required to furnish the location of competing franchises." (citations omitted)).  In finding the defendant company exempt from the requirements of Section 683 in *Arizona Family Florists*, the district court explicitly rejected the reasoning in prior cases within this District, including *Olivieri v. McDonald's Corp.*, 678 F. Supp. 996, 998 (E.D.N.Y. 1988).  2021 WL 4959426, at *3.

The Court finds the reasoning of *Arizona Family Florists* persuasive and declines to follow *Olivieri*.  As explained by the Honorable Joan M. Azrack in *Arizona Family Florists*, "*Olivieri* did

not address the actual language of the statute and instead relied on a Practice Commentary, which . . . has subsequently been revised and now indicates that disclosure [of financial information] is not required in that circumstance [i.e., when the franchise is exempt]." *Arizona Fam. Florists LLC*, 2021 WL 4959426 at *3; *see also* Kaufmann, Prac. Comment., N.Y. Gen. Bus. Law Ch. 20, art. 33, Refs. & Annos (McKinney's Cons. Law of N.Y. 2024) ("[F]ranchisors whose net worth . . . exceeds $15 million are exempted under [Section 684(3) of] the New York Franchise Act . . . provided that they furnish to prospective franchisees the minimalized disclosure document mandated by Section 684(2)(c) of the New York Franchise Act."); 4E N.Y. Prac., Com. Litig. in NYS Courts, § 123:4 (5th ed.) ("The large franchisor exemption provides that the state registration and disclosure requirements . . . do not apply to a franchisor that has a net worth in excess of $15 million."). Plaintiff's response that Section 683 of the New York Franchise Act "should be liberally construed to carry out its purpose of protecting franchises" is not grounded in any analysis of the provision's legislative history and ignores recent case law regarding this particular provision. (Pl.'s MSJ Opp'n, Dkt. 111-71 at 31.)

Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's Count II of the SAC and dismisses Plaintiff's Section 683 claim as a matter of law.

**B.    Plaintiff's Third Cause of Action: NY GBL § 687**

Community Care alleges that Interim knowingly made "misrepresentations, omissions, and financial performance representations" that induced Community Care to enter into the PSA and the Franchise Agreements, in violation of the NY GBL Section 687 ("Section 687"). (SAC, Dkt. 29 ¶¶ 128–35 (emphasis removed).)    Specifically, Plaintiff claims that (1) Interim misrepresented and concealed "critical deal points" from Plaintiff when it shared the Marcum Audit, the Blacktree Assessment, and the Watson Franchises' financial statements, as well as projected sales and earnings for Community Care, (*id.* ¶¶ 52, 65–66), and that (2) Interim omitted

from its disclosures to Plaintiff the extent of the debts owed by Watson as well as the investigations conducted by the NY AG into the Watson Franchises, (*id.* ¶¶ 69–72).[26]  As discussed below, Plaintiff's Section 687 claim survives as to Defendant's alleged misrepresentations and omissions about "critical deal points," but is dismissed as to Defendant's alleged failure to disclose information about the Watson Franchises.

Section 687 makes it "unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly: . . . [m]ake any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  N.Y. Gen. Bus. Law § 687(2)(b). "To state a claim under [Section] 687, [a plaintiff] must plead that (1) [the defendant] made an untrue or misleading statement of material fact, and that (2) [the plaintiff] reasonably relied on that statement, (3) causing harm to [the plaintiff]."  *Governara v. 7–Eleven, Inc.*, No. 13-CV-6094 (LAP), 2014 WL 4476534, at *4 (S.D.N.Y. Aug. 20, 2014).  "Plaintiffs do not need to plead" scienter, "because 'it is an affirmative defense . . . that said omission was not an intentional act.'"  *Id.* (first quoting N.Y. Gen. Bus. Law § 687(2)(b); then citing *Rosen v. Brookhaven Cap. Mgmt., Co.*, 194 F. Supp. 2d 224, 227 (S.D.N.Y. 2002) (holding that plaintiffs have no obligation to "anticipate and refute potential affirmative defenses" in their complaint)).

---

[26] Though not mentioned anywhere in the SAC, Plaintiff puts forward a secondary theory of fraud in its opposition brief, stating that "Interim completely misrepresented to Community Care what it believed about Pinnacle's ability to deliver on licenses and how long it would take." (Pl.'s MSJ Opp'n, Dkt. 111-71 at 20–21 (cleaned up).)  The Court agrees with Defendant that this theory of fraud—appearing for the first time in the opposition brief—is not properly in the case or before the Court and should therefore not be considered in ruling on Defendant's summary judgment motion. *See Guardian News, Inc. v. Idoni*, No. 08-CV-10064 (CS), 2011 WL 13383231, at *8 (S.D.N.Y. June 20, 2011) (observing that "in resolving a motion for summary judgment, the [c]ourt should not consider new factual allegations and legal theories not raised in the complaint.").

1.    Material Misrepresentations

The Court finds that summary judgment is inappropriate with respect to whether Defendant made misrepresentations of material fact to Plaintiff to induce it to enter into the PSA and Franchise Agreements.  First, as described *supra* Background Section I.A., the parties disagree as to whether the personal expenses spreadsheet and the royalty documents provided by Defendant to Plaintiff were "projections of earnings."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶¶ 268, 270–74.) Plaintiff argues that prior to signing the agreements, Defendant led Plaintiff to believe, "based on the pro forma [i.e., income statements and financial documents provided to Community Care] and the communications from Slupecki" that Plaintiff "could achieve profits of $3 million annually based on eliminating expenses and consolidations."  (*Id.* ¶ 264; *see also* Gatien Dep., Dkt. 111-1 at 154:20–155:15 (explaining that, based on the numbers in the Marcum Audit report, once Watson was replaced, "a lot of expenses . . . would be eliminated based on [Plaintiff] acquiring the business").)  Defendant responds by emphasizing that the documents disclosed to Plaintiff— including the Marcum Audit, the Blacktree Assessment, and income statements—all "disclosed the true state of the Watson Franchises," including all of Watson's liabilities.  (Def.'s MSJ Mem., Dkt. 110-1 at 15.)  The question of what the disclosures represented about Plaintiff's future profitability is a factual one that the jury must resolve.  A jury could conclude that Plaintiff reasonably believed based on these pre-agreement communications that Community Care would reap tremendous profits by entering into the PSA and Franchise Agreements.

Second, Plaintiff argues that the royalty documents it received—including a spreadsheet containing charts labeled "Royalty Model" and "Royalty Structure" and another spreadsheet modeling royalty credit for 3 years—were projections of earnings because "one could back into the sales or earnings by using the formulas Interim provided on what the franchise fees would be." (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 271; *see also* Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 44, 46; 8/3/2017

Email, Dkt. 110-24; 8/24/2017 Email, Dkt. 110-25.)  Defendant maintains that the "royalty models did not provide a representation of estimated earnings or revenue" because "[t]he purpose of the royalty models was to show how the proposed royalty structure would mechanically work using the sample data from 2016."  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 48.)  Again, this is a factual dispute for the jury to resolve.  A reasonable jury could assess these documents and conclude that the spreadsheets were "projections of earnings" because they contained future-looking dollar values and could be used to infer revenue amounts.

Thus, due to these genuine disputes of fact, Defendant has not met its burden at summary judgment as to these alleged material misrepresentations.

### 2.    Material Omissions

Turning to Plaintiff's allegations that Defendant omitted material facts—including the full accounting of the debts owed by Watson and the NY AG's investigation into the Watson Franchises after the "Haitian Incident"—the Court agrees with Defendant that these facts were either actually disclosed or were not material omissions.  Specifically, Plaintiff alleges that Defendant failed to disclose several of Watson's liabilities, including (1) a $358,267.80 judgment involving the State Insurance Fund, (2) a $492,000 judgment involving Wesco Insurance Company, (3) $64,020 owed in settlement agreements with Health Care Providers Self-Insurance Trust, (4) a $23,295 surcharge from the Health Facility Cash Assessment Program, (5) an outstanding tax levy of $24,038.19, (6) settlement agreements with the New York State Workers Compensation Board amounting to $836,794, (7) overpayments of $138,518.27 received from various entities which were "deducted from receivables earned and due" to Plaintiff, (8) a debt of $69,101.98 owed to Health Facility Cash Assessment Program, and (9) escrow deposits to be returned to specific patients in the amounts of $74,278.60.  (SAC, Dkt. 29 ¶ 69.)

It is undisputed that the first two liabilities listed above were incurred *after* the parties entered into the Franchise Agreements in 2017, (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 75–76), and therefore cannot form the basis of a fraud claim, *see Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 502 n.3 (S.D.N.Y. 2004) ("[A] party cannot claim that it was induced into a contract on the basis of fraud by the other party to the contract when the misrepresentation or omission underlying the purported fraud occurred only after the parties entered the contract.").  It is also undisputed that the third and sixth liabilities listed above— $64,020 and $836,794 owed in settlement agreements with Health Care Providers Self-Insurance Trust and the New York State Workers Compensation Board respectively—*were* in fact disclosed to Plaintiff through the Marcum Audit.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 26(b)–(c).)  As for the rest of the alleged non-disclosures, though Plaintiff alleges those facts in its SAC, they do not appear anywhere in Plaintiff's Rule 56.1 statement of undisputed facts.  Accordingly, the Court need not consider them since they are not supported by any evidence.  "Even a verified complaint need not be considered at the summary judgment stage if it is not referenced in a party's Rule 56.1 statement."  *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023) (citations omitted).

Plaintiff's claim of fraud based on Defendant's omission of the NY AG's investigations into, *inter alia*, the "Haitian Incident" is legally insufficient.  "Where a plaintiff seeks to show fraud by omission, as is the case here, it must also prove that the defendant had a duty to disclose the concealed fact." *Sea Tow Servs. Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*, 632 F. Supp. 3d 91, 106 (E.D.N.Y. 2022) (quotation and citation omitted).  It is undisputed that information about the "Haitian Incident"—where the NY AG investigated one of the Watson Franchises for putting out a discriminatory ad against Haitians in 2016—was covered by news sources and

publicly available.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 73.)  Under New York law, a plaintiff cannot establish justifiable reliance or a duty to disclose, for purposes of a fraud claim, where the information at issue is a matter of public record that could have been discovered through the exercise of ordinary diligence.  *See 246 Sears Rd. Realty Corp.*, 2012 WL 4174862, at *14.[27]

As for Plaintiff's other allegations concerning the NY AG's investigations into the Watson Franchise—such as the April 2018 letter from the NY AG's Medicaid Fraud Control Unit—it is undisputed that these investigations occurred *after* the parties had entered into the Franchise Agreements.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 77.)  Thus, for the same reasons discussed above, any evidence relating to these allegations cannot support Plaintiff's Section 687 fraudulent-inducement claim.

### 3.   Reasonable Reliance

Defendant also argues for summary judgment of Plaintiff's Section 687 claim on the basis that Plaintiff's reliance on any alleged misrepresentations or omission was not reasonable.

"New York takes a 'contextual view' in deciding whether reliance was reasonable." *Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2011 WL 5170293, at *14 (S.D.N.Y. Oct. 31, 2011) (quoting *J.P. Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004)).  "Among the factors a court may consider in assessing the reasonableness of an investor's reliance is whether the investor received any clear and direct signs of falsity; whether the investor had access to relevant information; whether the investor received a written (purported) confirmation of the truthfulness of the representations at issue, and whether the investor is

---

[27] Notably, courts have looked to New York common law in applying Section 687.  *See, e.g.*, *Coraud LLC v. Kidville Franchise Co., LLC*, 121 F. Supp. 3d 387, 394 (S.D.N.Y. 2015) (collecting cases about New York common law fraud cause of action to define "reasonable reliance" in the NY GBL Section 687 context).

sophisticated." *Coraud LLC v. Kidville Franchise Co., LLC*, 121 F. Supp. 3d 387, 394 (S.D.N.Y. 2015) (internal quotations and citations omitted). "[R]easonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment." *Id.* (citing *Brunetti v. Musallam*, 783 N.Y.S. 2d 347, 349 (N.Y. App. Div. 2004)).

Here, Plaintiff argues that it reasonably relied on Interim's representations that the Watson Franchises could be profitable in the future and that there was insufficient time for due diligence. Specifically, Plaintiff's President, Alexander Caro, testified in his deposition that, although no one at Interim explicitly instructed Community Care to not conduct any of its own due diligence, Larry Kraska, the former CEO of Interim, told Caro that "the timing was urgent" and that "[Plaintiff] didn't have [months] to do a normal due diligence . . . and that they [Interim] would provide all the information for due diligence directly to [Plaintiff]." (Caro Dep., Dkt. 111-8 at 101:20–102:7.) A reasonable jury could find that Caro's testimony as to Interim's representations is credible and that Plaintiff's decision to forgo a full due diligence check was reasonable within the context of this acquisition, notwithstanding Plaintiff's status as a sophisticated party. There is therefore a material issue of fact as to whether Plaintiff's reliance on Defendant's alleged misrepresentations and omissions was reasonable for purposes of Plaintiff's Section 687 claim.[28]

*    *    *

---

[28] Defendant's argument that Section 19.8 of the Franchise Agreements contains a disclaimer provision that precludes a claim under Section 687, (Def.'s MSJ Mem., Dkt. 110-1 at 23 n.15), was considered at length and rejected by this Court in its Dismissal M&O, *see Cmty. Care Companions, Inc.*, 2021 WL 12102892, at *9–10 (relying, *inter alia*, on Section 687 anti-waiver provision—i.e., that any "provision purporting to bind any person acquiring any franchise to waive compliance with any provision of [Section 687] . . . shall be void"—to deny Defendant's motion to dismiss Plaintiff's Section 687 claim as a matter of law (quoting *Coraud LLC v. Kidville Franchise Co., LLC*, 109 F. Supp. 3d 615, 620–21 (S.D.N.Y. 2015))). Defendant offers no reason for the Court to revisit this ruling.

Accordingly, Defendant's motion for summary judgment on Plaintiff's Section 687 claim is granted as to the alleged omissions regarding the extent of Watson's debts and the NY AG investigations into the Watson Franchise, but denied as to the alleged material misrepresentations in financial documents and modeling shared by Interim with Community Care prior to the parties entering into the Franchise Agreements.

## C.    Plaintiff's Fifth Cause of Action: Breach of Contract

Community Care alleges that Interim breached Section 19.6 of the Nassau Franchise Agreement by permitting Caring Angels, Inc. to operate in Nassau County in 2017 and 2018, which was an "Authorized Area" exclusively allocated to Community Care by the terms of the Agreement.[29]  (*See* SAC, Dkt. 29 ¶ 154; Nassau Franchise Agreement, Dkt. 110-5 at ECF 107.) Community Care further alleges that Interim breached Sections 5 and 10 of the Addendum by "failing to provide the required line of credit; and by failing to provide $75,000 for rebranding." (SAC, Dkt. 29 ¶ 154, Addendum, Dkt. 110-32 at 4–5.)  The Nassau Franchise Agreement and Addendum are both governed by Florida law.  (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 104; Addendum, Dkt. 110-32 at 5 (stating that the provisions of the Franchise Agreement, including those related to governing law, applies to the Addendum).)  The Court addresses Defendant's motion for summary judgment of each aspect of Plaintiff's breach of contract claim in turn.

---

[29] Section 19.6 of the Nassau Franchise Agreement provides that "[Interim] will not establish, and . . . will not authorize . . . any other person or firm to establish an office within the Authorized Area [of Nassau County] for the purpose of providing the services which [Community Care] is authorized to provide."  (Nassau Franchise Agreement, Dkt. 110-5 at ECF 107.)

1.   Section 19.6 of the Nassau Franchise Agreement

Defendant argues that the evidence shows that Interim terminated Caring Angels' franchise rights as to its Nassau County location in 2016, and that the contrary evidence that Plaintiff relies on is inadmissible and insufficient.  The Court agrees.

Community Care does not dispute that Interim served a formal notice of termination to Caring Angels, Inc.'s Nassau County location in 2016.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 80–81.) It nevertheless argues that "Interim allowed . . . Caring Angels, to operate in Nassau County in 2017 and 2018."  (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 402.)  As evidence, Community Care cites to an undated photo from Google Images of a house located at 321 Post Avenue, Westbury, NY— which it purports to be the Caring Angels Nassau County location—with a sign in the front that could be read to say "Interim."  (*See* Google Image, Dkt. 111-67 at ECF 2; *see also* Dkt. 110-46 at ECF 7 (noting Caring Angel's Nassau County address).)  Community Care also cites to an income statement from "someone . . . who was a friend of [Community Care Vice President Gatien, named George Gavarisi, who] was interested in purchasing a franchise [from Caring Angels President Dudani, and] received documentation regarding the performance of that franchise," which showed that Caring Angels earned gross revenues in 2017 and 2018.  (*See* Dkt. 111-68; *see also* Gatien Dep., Dkt. 111-1 at 242:23–244:20.)

The Court agrees with Defendant that not only is this purported income statement inadmissible hearsay, it does not explicitly state that the gross revenues for 2017 and 2018 are from Caring Angel's *Nassau County* location.  The parties do not dispute that Caring Angels ran other Interim franchises located outside Nassau County through 2017 and 2018.  (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 83.)  The gross revenues reflected on the purported income statement for those two years could therefore have been from other Caring Angels locations.  This income statement, along with the undated Google Images photograph, does not even amount to a "scintilla of evidence"

that Caring Angels operated a Nassau County location in 2017 and 2018. *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial [to survive summary judgment]." (cleaned up and citation omitted)); *see also Gorzynski*, 596 F.3d at 101 (explaining that a plaintiff must "show more than 'some metaphysical doubt as to the material facts'" to survive summary judgment (quoting *Matsushita*, 475 U.S. at 586)). Plaintiff has thus failed to meet its burden to demonstrate a genuine issue of material fact to defeat summary judgment.

The Court therefore dismisses the portion of Plaintiff's breach of contract claim in Count V that is based on an alleged violation of Section 19.6 of the Nassau Franchise Agreement.

### 2.    Section 5 of the Addendum

Plaintiff also alleges in Count V of the SAC that Defendant breached Section 5 of the Addendum, which provides, in relevant part:

> As a condition to re-opening as an Interim HealthCare Franchised Business, [Community Care] agrees to re-brand the existing businesses in the manner required by [Interim]. [Interim] agrees to provide [Community Care] with $75,000 to be used solely in connection with such re-branding, but [Interim] will have the right to approve the manner in which this $75,000 is spent.

(Addendum, Dkt. 110-32 at 4.) Plaintiff claims that Defendant breached Section 5 by not providing Plaintiff with the promised $75,000 for re-branding.

While the parties do not dispute certain facts relating to this claim—i.e., that Plaintiff never displayed Interim signs or operated under its name, never requested the $75,000 from Interim, never provided any plans for re-branding, and that any re-branding that did occur was switched back, (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 90, 92–97)—Defendant argues that it did not breach its obligation under Section 5 because Plaintiff "never met the preconditions for receiving the $75,000," (Def.'s MSJ Mem., Dkt. 110-1 at 26). In response, Community Care argues that, per

the terms of the Addendum, it was never required to request the $75,000 re-branding funds from Interim or receive prior approval for the funds.  (Pl.'s MSJ Opp'n, Dkt. 111-71 at 32–33.)

"An essential element of a claim for breach of contract is the existence of a material breach of a contractual duty." *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 47 (Fla. Dist. Ct. App. 2021) (quoting *Chetu, Inc. v. KO Gaming, Inc.*, 261 So. 3d 605, 606 (Fla. Dist. Ct. App. 2019)).  Plaintiff is correct that the text of the Addendum does not specify that the funds will be made available to Plaintiff *only upon* request or prior approval.  At the same time, the Addendum does not state that Interim had any duty to furnish the $75,000 to Plaintiff *before* the re-branding actually occurred.  "[W]hen a contract is silent on a matter, the court cannot impose contractual rights and duties under the guise of construction."  *Id.* (cleaned up) (quoting *Blok Builders, LLC v. Katryniok*, 245 So. 3d 779, 784 (Fla. Dist. Ct. App.  2018)).  The Addendum is ambiguous since "it is fairly susceptible to different constructions," *Teague v. Teague*, 122 So. 3d 938, 942 (Fla. Dist. Ct. App. 2013) (citation omitted), and this ambiguity creates "an issue of fact . . . that cannot be resolved by summary judgment," *Talbott v. First Bank Fla., FSB*, 59 So. 3d 243, 245 (Fla. Dist. Ct. App. 2011) (citation omitted).  Further, Defendant has not presented any evidence establishing that its interpretation of the Addendum is the only reasonable interpretation.  The extrinsic evidence cited to—i.e., that Plaintiff never rebranded, did not request the funds, and never provided any plans for re-branding—plausibly supports either interpretation of the Addendum.

Defendant further argues that Plaintiff has failed to show damages resulting from the breach, as is required for a breach of contract claim under Florida law.  *See Synergy Contracting Grp., Inc. v. Fednat Ins. Co.*, 332 So. 3d 62, 65 (Fla. Dist. Ct. App. 2021).  Gatien testified in his deposition that Community Care "spent funds," including "reordering [paper] forms under [the

name of] Interim Healthcare" and submitting "applications" for "transition[ing] all of [Community Care's] employees over to Interim Healthcare."  (Gatien Dep., Dkt. 111-1 at 183:21–184:13.) Though Community Care did not specify a dollar amount for how much they spent on rebranding expenses—conceding that the transformation to an Interim office was "slim to none" and that any rebranding to Community Care was "switched back," (Def.'s MSJ Mem., Dkt. 110-1 at 16)—the Court draws all reasonable inferences in favor of Plaintiff and concludes that the damages element of the breach of contract claim has been sufficiently proven.  As such, since ambiguities remain as to the interpretation of the Addendum, summary judgment as to Plaintiff's claim regarding Section 5 of the Addendum is inappropriate at this junction.

Accordingly, the Court denies summary judgment as to Plaintiff's breach of contract claim based on Section 5 of the Addendum.

### 3.    Section 10 of the Addendum

Defendant also seeks summary judgment on Plaintiff's breach of contract claim based on Section 10 of the Addendum, in which Interim agreed to provide Community Care "with a secured line of credit in the amount of up to two million dollars[.]"  Section 10 further specifies that:

> [t]he [$2 million] line of credit shall be personally guaranteed by Franchisee's principal shareholder, AJ Caro, and shall be secured by a first priority security interest in substantially all of Franchisee's assets. . . . *[T]his line of credit is subject to Franchisee's execution of a separate loan agreement, guaranty and security agreement, each prepared by . . . Franchisor.*

(Addendum, Dkt. 110-32 at 5 (emphasis added).)  Community Care alleges that Interim breached Section 10 by not providing the $2-million line of credit.  Each side tries to use the undisputed fact that Community Care never signed the guaranty and security agreement it received from Interim to argue for or against a finding of breach.  (*Compare* Pl.'s MSJ Opp'n, Dkt. 111-71 at 33 ("a guarantee was not signed [and a security agreement was not provided] because the line of credit was never provided"), *with* Def.'s MSJ Mem., Dkt. 110-1 at 27 ("as a precondition for receiving

the line of credit, [Section] 10 requires . . . a personal guaranty, [and a security agreement.] This never happened.").) Defendant has the better of the argument based on Section 10's language.

In contrast to the ambiguous language in Section 5, Section 10 explicitly states that Interim's obligation to extend the line of credit is "subject to [Community Care]'s execution" of, *inter alia*, the guaranty and security agreements. (Addendum, Dkt. 110-32 at 5.) Community Care fails to provide any evidence to support its argument that Interim was obligated to provide the line of credit *before* it received those agreements, which is contrary to the plain language of the provision. When the language of a contract is clear and unambiguous, courts must give effect to the contract as written. *See, e.g.*, *Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, 771 So. 2d 628, 631 (Fla. Dist. Ct. App. 2000). Here, the undisputed evidence shows that Plaintiff never executed or submitted a guaranty and security agreement to Interim, despite having been provided one; this fact alone defeats Plaintiff's breach of contract claim with respect to Section 10.

The Court therefore grants Defendant's motion for summary judgment on Plaintiff's breach of contract claims as to Section 10 of the Addendum.

\*        \*        \*

In sum, the Court grants Defendant's summary judgment motion as to the alleged breaches of Section 19.6 of the Nassau Franchise Agreement and Section 10 of the Addendum. The Court denies summary judgment as to the alleged breach of Section 5 of the Addendum.

### D.  Plaintiff's Seventh Cause of Action: Breach of Fiduciary Duty

Community Care alleges that Interim "breached the Franchise Agreements by, among other things, utterly failing at every opportunity to take commercially reasonable efforts in carrying out its obligation to obtain or transfer the licenses." (SAC, Dkt. 29 ¶ 168 (cleaned up).) This claim is based on the parties' alleged oral agreement that Interim would obtain or transfer the licenses Plaintiff needed to operate as an Interim franchisee.

There are several questions the Court must consider in deciding this claim. First, there is the question of whether the evidence is sufficient to establish that the alleged oral agreement existed between the parties. If so, then the Court must determine whether that agreement is enforceable as a legal matter. Finally, if there is an enforceable oral agreement, the Court must determine whether it gave rise to a fiduciary duty that can form the basis of Plaintiff's breach of fiduciary duty claim. As discussed below, even though it is undisputed that an oral agreement existed, the Court finds it unenforceable as a matter of law and that therefore Plaintiff's breach of fiduciary duty claim must be dismissed.

As to the first issue, there is no genuine dispute regarding whether an oral agreement existed between the parties, pursuant to which Interim agreed to obtain or transfer the necessary LHCSA licenses for Plaintiff. Though nothing in the text of the Franchise Agreements explicitly requires Interim to obtain or transfer those licenses,[30] Caro testified in his deposition that, on behalf of Community Care, he entered into "several [oral] agreements" with Interim: "One was with Mike Slupecki when he asked if we would be willing to give up our Queens location because they already had an existing franchisee in that territory. Another was with Larry Kraska and Mike Slupecki when they agreed to expedite the licensing and hire a lobbyist to get us the license in a short period of time." (Caro Dep., Dkt. 111-8 at 238:7–24.) The record evidence also plausibly supports the existence of such an oral agreement. For instance, it was Interim—not Community Care—that paid the $7,500 retainer for Pinnacle to assist Community Care with the licensure process. (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 360.) Pinnacle's engagement letter states that it was providing "consultative services" to "Interim Healthcare Inc. and Community Care Companions,

---

[30] Indeed, the Franchise Agreements state that "[Community Care] shall obtain . . . all licenses." (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 107.)

Inc. d/b/a Interim Healthcare of New York" and was addressed only to Kraska, the former CEO of Interim. (*Id.* ¶ 356.) And though Slupecki testified in his deposition that he did not know what entering into an oral agreement meant, he also stated that Interim was "arm in arm [with Community Care] trying to help navigate the licensure process." (Slupecki Dep., Dkt. 111-3 at 87:4–88:7.) Thus, the parties' testimony and other evidence overwhelmingly support the conclusion that an agreement existed between the parties, pursuant to which Interim agreed to secure the transfer of licenses on Community Care's behalf.

The next issue is whether this oral agreement is enforceable as a matter of law. Interim argues that the oral agreement cannot serve to modify the terms of the Franchise Agreements because it would run afoul of the merger clause in Section 19.8 of the Franchise Agreements, which specifies that each of the Franchise Agreements is the "entire agreement." The Court agrees.

Section 19.8 of the Franchise Agreements states, in relevant part that "this Agreement . . . constitute[s] the entire agreement between the parties with reference to the subject matter of this Agreement and supersede[s] any and all prior negotiations, undertakings, representations and agreements." (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 107.) Thus, by its plain terms, Section 19.8 precludes the enforcement of any oral agreement between the parties that existed before the execution of the Franchise Agreements. Such merger clauses are generally enforceable. *See World-Class Talent Experience, Inc. v. Giordano*, 293 So. 3d 547, 549 (Fla. Dist. Ct. App. 2020) ("A merger clause makes extrinsic agreements unenforceable unless they are contained within the written contract." (cleaned up and citation omitted)).

This result is reinforced by application of the parol evidence rule, which bars evidence regarding "verbal agreements between the parties to a written contract, made before or at the time

of the execution of the contract." *The Race, Inc. v. Lake & River Recreational Props., Inc.*, 573 So. 2d 409, 410 (Fla. Dist. Ct. App. 1991).[31]  Here, the record evidence makes clear that the oral agreement was reached *before* the parties entered into the written contract in October 2017. (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 285 (citing an August 2017 email from Interim stating that it "will proceed with engaging [Interim]'s consultants to assist with expanding the license for [Community Care]" (alterations in original)).)  Moreover, the oral agreement clearly contradicted the express terms of the Franchise Agreements, which states that "[Community Care] shall obtain . . . all licenses."  (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 89.)  Plaintiff therefore cannot use evidence of the oral agreement to claim that it modified the terms of the Franchise Agreements.

The Florida statute of frauds also precludes enforcement of the oral agreement between the parties regarding licensure.  In pertinent part, the Florida statute of frauds provides that "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise . . . shall be in writing and signed by the party to be charged therewith."  Fla. Stat. Ann. § 725.01.  Defendant argues that the statute of frauds governs the Franchise Agreements because they "cannot be performed within one year since they have a ten-year term."  (Def.'s Mem., Dkt. 110-1 at 29 (citation omitted).)

---

[31] Once again, the Court applies the Florida parol evidence rule and the Florida statute of frauds because the choice-of-law provision in the Franchise Agreements provides for Florida law. (*See* Nassau Franchise Agreement, Dkt. 110-5 at ECF 104; Addendum, Dkt. 110-32 at 5); *In re Mayo*, 112 B.R. 607, 666 (Bankr. D. Vt. 1990) ("The prevailing view is that the statute of frauds, like a parol[] evidence rule, is a substantive rule of evidence for choice of law . . . purposes."); *Walker v. Carter*, 210 F. Supp. 3d 487, 499 (S.D.N.Y. 2016) (explaining that the statute of frauds is considered substantive law for purposes of determining what law governs).  Further, the parties' briefs do not dispute that Florida's statute of frauds applies in this case.  *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (explaining that under New York's choice-of-law rules, "where the parties agree that [a certain jurisdiction's] law controls, this is sufficient to establish choice of law").

Importantly, Plaintiff offers no meaningful response to Defendant's arguments, simply stating that "[t]he merger clause and the statute of frauds . . . cannot be directed to the fiduciary duty claim." (Pl.'s MSJ Opp'n, Dkt. 111-71 at 31 n.8.) Nor can Plaintiff successfully claim that this oral agreement was a "collateral agreement" that was "distinct from and independent of" the Franchise Agreements so as to avoid application of the parol evidence rule. *See* 29A Am. Jur. 2d Evidence § 1102 ("The parol evidence rule is not applicable to a purely collateral contract distinct from, and independent of, the written agreement, even though it relates to the same general subject matter and grows out of the same transaction, *if it is not inconsistent with the writing*." (emphasis added)). Here, because the oral agreement is inconsistent with the writing in the Franchise Agreements, which specifies that Community Care shall obtain licenses, (*see, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 89), the parol evidence rule applies. Moreover, the license application with the NYSDOH was a tremendously important issue to both parties; indeed, it was at the core of and vital to the Franchise Agreements. Thus, who was responsible for obtaining licensure for Community Care was not a topic that reasonably would have been omitted from the parties' written contract, and as such, does not fit within the general understanding of collateral agreements that are excluded from the parol evidence rule. *See* 29A Am. Jur. 2d Evidence § 1102 ("The collateral-agreement exception to the parol evidence rule applies only to matters that one would not reasonably expect to be merged into the final written contract or matters that would naturally be omitted from the written instrument.").

Since the oral agreement between the parties forms the basis of Defendant's alleged fiduciary duty to promptly obtain or transfer the LHCSA licenses and since the Court has found that oral agreement unenforceable as a matter of law, Plaintiff's claim of breach of fiduciary duty

cannot survive.  Defendant's motion for summary judgment on Count VII of the SAC for breach of fiduciary duty is thus granted.

### III.    Defendant's Motion for Summary Judgment as to its Third Party Complaint

Defendant seeks summary judgment as to three causes of action—Counts I, III, and VI—in its Counterclaims and Third-Party Complaint against Community Care and Third-Party Defendants Caro and Gatien.[32]

#### A.    Defendant's First Counterclaim/Third-Party Complaint Cause of Action: Breach of Contract

In its first counterclaim/third-party complaint cause of action, Defendant alleges, *inter alia*, that Plaintiff breached (1) the royalties provisions contained in Section 11 of the Franchise Agreements, as well as Sections 2 and 3 of the Addendum, (2) the trade name provisions contained within Sections 4.4, 8.1, and 8.4 of the Franchise Agreements, (3) the re-branding provisions in Section 5 of the Addendum, (4) the non-compete provisions in Section 10(a) and (b) of the Franchise Agreements, and (5) the Authorized Area provisions in Section 8.1 of the Franchise Agreements.[33]  (TPC, Dkt. 40 ¶¶ 196–220.)

---

[32] Defendant is not seeking summary judgment on Counts II (Breach of Contract against Gatien and Caro), IV (Fraud against Gatien, Caro, and Does 1–10), and V (Unjust Enrichment against Community Care) of its Third-Party Complaint.  Nor did Plaintiff.  Those counts will therefore proceed to trial.

[33] The Third-Party Complaint also alleges breaches of the following provisions under Count I: (1) the website provisions contained within Sections 4.5, 8.1, and 8.4 of the Franchise Agreements; (2) the insurance provisions in Section 8.8 of the Franchise Agreements, (3) the reporting provisions of Sections 8.11 and 8.12 of the Franchise Agreements, and (4) the mediation provision in Section 18 of the Franchise Agreements.  (TPC, Dkt. 40 ¶¶ 196–200.)  Defendant does not argue for summary judgment specifically as to the alleged breaches of these provisions in its memorandum of law.  The Court thus assumes that these third-party breach of contract claims remain in dispute and will be resolved at trial.

As an initial matter, Plaintiff argues that it has not breached the Franchise Agreements because they should be rescinded upon a finding that Defendant engaged in fraudulent conduct and induced Community Care to enter into the PSA and the Franchise Agreements.  (Pl.'s MSJ Opp'n, Dkt. 111-71 at 33.)  As mentioned *supra* Discussion Section II.B., there are genuine issues of material facts as to whether Defendant engaged in fraudulent conduct by making misrepresentations in financial documents and modeling shared by Interim with Community Care prior to the parties entering into the Franchise Agreements.  "A contract induced by fraud or misrepresentation is voidable and subject to rescission."  *M & T Bank Corp. v. LaSalle Bank Nat. Ass'n*, 852 F. Supp. 2d 324, 343 (W.D.N.Y. 2012); *see also* N.Y. Gen. Bus. Law § 691(1) ("A person who offers or sells a franchise in violation of [Section 687] . . . is liable to the person purchasing the franchise for damages, and, if such violation is willful and material, for rescission.").  If, at trial, the jury finds that Defendant violated Section 687, Plaintiff can rescind the Franchise Agreements, provided that such violation was willful and material.

The Court agrees that if Plaintiff prevails on its fraudulent inducement claim, the jury *could* find that the Franchise Agreements should be voided.  However, the Court nonetheless addresses whether Defendants are entitled to summary judgment on any of their counterclaims because the jury could also decide that recission is not warranted.  The effects of the Court's rulings as to Defendant's summary judgment claims will depend on the jury's decision on whether the Franchise Agreements must be rescinded.

1.    Trade Name and Re-Branding Provisions

With respect to the trade name and re-branding provisions, Community Care argues that it was not in breach because "the Franchise Agreements were not approved" and because "Community Care was not licensed to operate under the Interim name."  (Pl.'s MSJ Opp'n, Dkt. 111-71 at 34.)  The Court disagrees.

As explained *supra* Background Section 1.C., on August 2, 2018, the New York State Public Health and Health Planning Council's Committee entered a resolution to approve Community Care's application to operate as an Interim franchise, contingent upon, *inter alia*, "[a] copy of the franchise agreement of the applicant, which is acceptable to the Department." (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 132–35.) On October 12, 2018, Gray, the Director of the NYS Division of Home and Community Based Services, sent a letter to Plaintiff's Vice President, Gatien, noting that "all legal contingencies associated with this application have been satisfied by Community Care Companions as of August 8, 2018," and that "a license will be issued that reflects all approved services and the geographical service area to be served by each office." (*Id.* ¶¶ 146–47.) The NYSDOH issued Plaintiff new LHCSA licenses dated November 20, 2018. (*Id.* ¶ 148.) The licenses, however, did not have the name "Interim"—rather, they were made out to "Community Care." (Def.'s 56.1 Reply, Dkt. 115-1 ¶¶ 428–29.)

The record evidence makes clear that the NYSDOH did approve the Franchise Agreements and that Community Care's name on the licenses issued by DOH was likely a naming error. The license application submitted to the NYSDOH clearly stated that the application was for Community Care to operate as an Interim franchise. (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 117, 119–21.) The "Certificate of Assumed Name" submitted in connection with the Merger Application states that the Assumed Name should be "Interim Healthcare of NY." (*Id.* ¶ 124.) Though Community Care claims that it was subsequently cited by the NYSDOH and "told that it could not operate under the Interim name because its licensure was in the name of Community Care," (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 429 (citing Gatien Dep., Dkt. 111-1 at 183:4–20)), it is undisputed that Community Care never attempted to correct the naming error on the licenses, (Pl.'s 56.1 Resp., Dkt. 111-72 ¶ 163). Indeed, Defendant's expert Cicero is expected to testify at trial that

Community Care "could have easily requested a correction to the operating licenses" issued in its name. (*See* Cicero Report, Dkt. 112-2 at 16.) There is no dispute that Community Care did not rebrand any of its existing locations to "Interim Healthcare," and any rebranding that did occur was "switched back" to Community Care's name. (Pl.'s 56.1 Resp., Dkt. 111-72 ¶¶ 90, 92.) The Court therefore finds that Plaintiff has breached the trade name provisions, namely Sections 4.4, 8.1, and 8.4 of the Franchise Agreements, which, *inter alia*, required Community Care to operate an office under the name Interim Healthcare.

As for the rebranding provision in Section 5 of the Addendum, the Court has already found that there is a material issue of fact regarding whether Defendant performed its duty under the provision and how the provision should be properly construed. *See supra* Discussion Section II.C.2. The Court therefore denies Defendant's summary judgment on the rebranding provision.

2.   Royalties Provision

With respect to the royalties provision, Community Care asserts that royalties were not owed, (Pl.'s MSJ Opp'n, Dkt. 111-71 at 34), and the Court concludes that there remains a genuine dispute of fact as to when royalties would have begun to accrue under the terms of the Addendum. The parties agree that the "No Royalty" time period of one year—during which Plaintiff was not required to pay Defendant any royalties—would have begun on or about January 1, 2019, and thus ended in January 2020. (*Id.* ¶ 144.) But in the same email confirming the start date for royalties, Gatien clarified that "the transfer consists of many components in addition to just the DOH license. I will need to acquire my own Medicaid billing numbers and will still be dependent on Mr. Watson . . . until we have these billing numbers." (Email dated 9/20/2018, Dkt. 110-75 at ECF 2–3.) Thus, there remains a material factual dispute as to the start date for royalties, which cannot be resolved on summary judgment.

3.    Authorized Area Provision

There is no genuine dispute of fact regarding whether Plaintiff breached the Authorized Area provision of the Franchise Agreements.  Section 8.1 specifies that Community Care "may solicit customers and provide the services authorized by this agreement . . . only at locations within the Authorized Area." (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 88.)  The parties do not dispute that, in 2023, Plaintiff reopened a location in Queens, which is not an "[A]uthorized [A]rea" under the Franchise Agreements.  (Pl.'s 56.1 Resp., Dkt. 111-72  ¶¶ 157–58.)  Plaintiff simply states that "Community Care has serviced some patients in Queens because they could not be transferred."  (Pl.'s MSJ Opp'n, Dkt. 111-71 at 34.)  This is not a defense or meaningful response to the breach of contract claim.  The Court thus finds that Plaintiff breached Section 8.1 of the Franchise Agreements.

4.    Non-Compete Provision

Section 10(a) requires Community Care to not "engage in any business or activity competitive to" Interim. (*See, e.g.*, Nassau Franchise Agreement, Dkt. 110-5 at ECF 94.)  Plaintiff responds, without saying more, that "Interim has not presented any evidence that Community Care is competing against any Interim franchise."  (Pl.'s Opp'n, Dkt. 111-71 at 34–35.)  Community Care closed its Queens location, (Caro Dep., Dkt. 111-8 at 241:11–14), but reopened it in 2023 to serve 22 patients, (Def.'s 56.1 Reply, Dkt. 115-1 ¶ 280; *see also* Gatien Dep., Dkt. 111-1 at 39:8– 19 (explaining that prior to reopening the Queens location, Community Care continued to serve Queens patients out of their Smithtown branch)).  Interim also operates its own Queens location, so Community Care's Queens location did "compete" with Interim at least in terms of geographic proximity.  (*See* Caro Dep., Dkt. 111-8 at 238:15–24 (explaining that Interim had its own pre-existing Queens location).)  But there remains a genuine dispute as to whether sales earned from servicing 22 patients at the Queens location constituted a *material* breach of the non-compete

52

provision.  Further, Interim has not alleged any facts outlining the damages it sustained from Community Care's operation of the Queens location starting in 2023.  For these reasons, the Court denies summary judgment on this claim.

The Court therefore grants in part and denies in part Defendant's motion for summary judgment on the breach of contract claims in its Third-Party Complaint.  Specifically, Defendant's motion for summary judgment on breach of the royalties provision, re-branding provision, and the non-compete provision is denied.  Defendant's motion for summary judgment on breach of the trade name provision and the Authorized Area provision is granted.  As noted above, the effects of the Court's rulings as to Defendant's summary judgment claims will depend on the jury's decision on whether the Franchise Agreements must be rescinded.  The jury will be instructed at trial that they may only consider Defendants' breach of contract counterclaims relating to the royalties, re-branding, and non-compete provisions if the Franchise Agreements are not voided.  Further, if the Franchise Agreements are not voided, the jury will not be asked to decide Defendants' breach of contract claims relating to the trade name and Authorized Area provisions; the Court will simply enter a finding of liability against Plaintiffs on those counterclaims, and Defendants will be permitted to introduce evidence relating to damages.

### B. Defendant's Third Counterclaim/Third-Party Complaint Cause of Action: Breach of Good Faith and Fair Dealing

In its third counterclaim/third-party complaint cause of action, Defendant alleges that Plaintiff breached the covenant of good faith and fair dealing ("breach of good faith") because Defendant "relied upon Community Care and [Third-Party Defendants] to deal fairly and to take no action to deny Interim Healthcare its royalty payments, non-compete protections, and all other benefits owing to Interim Healthcare under the Franchise Agreements."  (TPC, Dkt. 40 ¶ 230.) Defendant argues that Community Care "sabotage[d] Interim's ability to obtain royalties" and

"conspired to avoid paying royalties by denying that it had the requisite licenses and refusing to correct a *de minimis* naming error on the licenses it received."  (Def.'s MSJ Mem., Dkt. 110-1 at 34.)  In response, Plaintiff argues that Defendant's claims are duplicative of their breach of contract claims and should therefore be dismissed.  (Pl.'s MSJ Opp'n, Dkt. 111-71 at 35.)  It also argues that genuine issues of fact remain as to whether the NYSDOH issued the licenses in the name of Interim.  (*Id.* at 36.)

First, as the Court explained *supra*, the record evidence makes clear that the NYSDOH did approve the Franchise Agreements and that Community Care's name on the licenses issued by the NYSDOH was likely a naming error.  Community Care's argument on those grounds therefore fails.

Second, Defendant's breach of good faith claim is not duplicative of its breach of contract claim.  Under Florida law, alleging a breach of contract claim is a necessary prerequisite for maintaining a breach of good faith claim.  *See Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001) ("[A] claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.").  The covenant of good faith and fair dealing "is intended to protect 'the reasonable expectations of the contracting parties in light of their express agreement.'"  *Id.* (quoting *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1438 (S.D. Fla. 1996)).  The Florida Supreme Court has recognized that "a claim arising from bad faith is grounded upon the legal duty to act in good faith, and is thus separate and independent of the claim arising from the contractual obligation to perform."  *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006) (cleaned up) (citation omitted).  At the same time, "Florida law is clear" that "where a claim for breach of [good faith] is indistinguishable from

a claim for breach of contract, the claim for breach of [good faith] is impermissibly duplicative and properly dismissed." *Alhassid v. Bank of Am., N.A.*, No. 14-CV-20484, 2015 WL 11110557, at *8 (S.D. Fla. Nov. 4, 2015).

Here, Defendant's breach of contract claim—that Plaintiff breached the royalties provision contained in Section 11.1 of the Franchise Agreements, as well as Sections 2 and 3 of the Addendum by failing to pay royalties, (TPC, Dkt. 40 ¶¶ 199–200)—is related to, as it must be, but separate from the breach of good faith claim, which focuses on Community Care's alleged use of the naming error in the licenses "as a pretext to avoid paying royalties," (Def.'s MSJ Reply, Dkt. 115 at 18). Defendant is therefore alleging that it had a "reasonable expectation" that Plaintiff would pay royalties notwithstanding the naming error on the licenses, and that Plaintiff's decision to use the naming error as a way to avoid performing under the contract was in bad faith. *Ins. Concepts & Design, Inc.*, 785 So. 2d at 1234. Defendant's breach of good faith claim is thus not duplicative of its breach of contract claim, and Plaintiff's argument on this ground fails.[34]

Under Florida law, when the breach of contract claim is extinguished, the breach of good faith claim too must be dismissed. *See Ahearn v. Mayo Clinic*, 180 So. 3d 165, 170 (Fla. Dist. Ct. App. 2015). Here, we have the inverse: Defendant's breach of contract claim is proceeding to

---

[34] That said, to the extent that Defendant points to contract provisions that are not explicitly alleged to have been violated, the Court must dismiss those claims. For example, Defendant's reply brief argues that Plaintiff violated the covenant of good faith and fair dealing by not fulfilling its obligations to maintain all licenses necessary for operating the franchise, as required by Section 8.6 of the Franchise Agreements. (Def.'s MSJ Reply, Dkt. 115 at 18.) But Defendant does not allege a breach of Section 8.6 of the Franchise Agreements. (*See* TPC, Dkt. 40 ¶¶ 196–220.) Defendant thus cannot maintain a claim of the breach of good faith and fair dealing based on this provision. *See Share v. Broken Sound Club, Inc.*, 312 So. 3d 962, 969–70 (Fla. Dist. Ct. App. 2021) ("Florida follows the majority view that there can be no independent cause of action brought for breach of the covenant of good faith and fair dealing . . . . Rather, a breach of that covenant must be tied to the performance of an express term of the contract." (cleaned up and citations omitted)).

trial. Since "the duty of good faith performance does not exist until a [movant] can establish a term of the contract the other party was obligated to perform and did not," *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. Dist. Ct. App. 2005), and since Defendant's contract claim is proceeding to trial, the Court denies summary judgment on the good faith claim, *see Harrod v. Express Scripts, Inc.*, No. 17-CV-1607 (TGW), 2017 WL 11615769, at *6–7 (M.D. Fla. Nov. 27, 2017) (explaining, at the motion to dismiss stage, that because the court could not evaluate if defendant breached the contract, the breach of good faith claim must also survive). Furthermore, applying Florida law at trial, Defendant can recover separately on both the breach of contract claim and the breach of good faith claims. *See, e.g.*, *All Serv. for You v. Hawa*, No. 13-2010-CA-49664, 2014 WL 10676675 (Fla. Cir. Ct. Nov. 18, 2014) (jury verdict awarding $15,288 to plaintiff for breach of contract and $15,288 for breach of good faith).

For these reasons, the Court denies Defendant's motion for summary judgment on its breach of the covenant of good faith and fair dealing claims.

## C. Defendant's Sixth Counterclaim/Third-Party Complaint Cause of Action: Preliminary and Permanent Injunction

Lastly, in its sixth counterclaim/third-party complaint cause of action, Defendant seeks "preliminary and permanent injunctive relief" against Community Care and Third-Party Defendants to prevent "irreparable harm, including . . . misuse of [Interim's] Trade Secrets, diminishing of the Interim Healthcare trade name, and unfairly competing with Interim Healthcare." (TPC, Dkt. 40 ¶¶ 259, 263.) Moreover, Interim seeks to enforce its "Step-In Rights under [Section] 16.2 of the Franchise Agreements which arise upon Community Care's default under the terms of the Franchise Agreements." (*Id.* ¶¶ 260, 263.)

But the injunctive relief that Defendant seeks are not "causes of action"; they are forms of remedies.  *See Chiste v. Hotels.com LP*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010) ("Declaratory judgments and injunctions are remedies, not causes of action."); *Williams v. Walsh*, 558 F.2d 667, 671 (2d Cir. 1977) ("[T]he cause of action is something distinct from the remedy or the relief sought." (quoting *Dennison v. Payne*, 293 F. 333, 344 (2d Cir. 1923)).  The Court thus *sua sponte* dismisses Defendant's sixth cause of action.  *See Chiste*, 756 F. Supp. 2d at 406 (dismissing party's claims for declaratory and injunctive relief because they are not causes of action).

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiff's motion to strike the expert report of Frank Cicero and grants in entirety Defendant's motion to strike the rebuttal expert report of Roy Breitenbach.  Plaintiff's claims for violation of New York General Business Law Section 687 on the narrower grounds specified herein and for breach of contract as to Section 5 of the Addendum may proceed to trial.  All of Plaintiff's other claims are dismissed. The Court further denies summary judgment on Defendant's counterclaims relating to the royalties, re-branding, and non-compete provisions, and grants it on the counterclaims relating to the trade name and Authorized Area provisions—though the effect of these rulings will depend on the jury's decision on whether the Franchise Agreements must be rescinded.  The Court also denies summary judgment on Defendant's counterclaims for breach of good faith.  Lastly, the Court *sua sponte* dismisses Defendant's sixth cause of action for preliminary and permanent injunction.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated:  March 27, 2025
         Brooklyn, New York